Case 84.—ACTION BY ALBERT C. HATHAWAY'S EXECUTRIX
AGAINST LOUISVILLE, H. & St. L. R. CO. FOR CAUSING
THE DEATH OF PLAINTIFF'S INTESTATE.—December 16.

## Louisville, H. & St. L. R. Co. v. Hathaway's Ex'tx.

Appeal from Jefferson Circuit Court, Common
Pleas Branch, Second Division.

THOMAS R. GORDON Judge.

Judgment for plaintiff. Defendant appeals. Reversed.

1. Railroads—Killing Trespasser—Reasonable Diligence—Keeping
Lookout—Appellee's intestate, Albert C. Hathaway, who had
been on a protracted drunken debauch, wandered out on appellant's railroad and lay down on the roadbed, with his
head between two projecting ties, his feet and body somewhat
out from the rails. He was discovered by the trainmen,
as a freight train approached him, and as soon as it could
be ascertained that he was a human being, every possible
means was made by the trainmen to avoid injuring him.
Just before the train reached him he threw his arm out
on the rail and the wheel ran over it causing his death.
Held—That as decedent was a mere trespasser upon appellant's property it owed him no lookout duty whatever,
and is only responsible for any injury inflicted which reasonable diligence on its part after his peril was discovered would
have averted.

2. Negligence—Knowledge of Intestate's Danger—Upon the theory
that appellee's intestate was in actual peril as he lay near
the track at the time he was first observed the evidence
fails to show any negligence on the part of the corporation
under the well-settled rule of its duty to trespassers. From
the time that its employes knew the object they had heretofore seen lying near the track was a man, there is no
dispute that everything was done which could have been done
to stop the train, and we do not think appellant owed the
decedent any duty prior to that time.

3. Apparent Danger—New Act of Peril by Intestate—If the railroad's employes in charge of a moving train see one in appar-

Louisville, H. & St. L. R. Co. v. Hathaway's Ex'tx.

ent danger by his proximity to the track and they fail to use ordinary diligence to save him, and the apparent danger is found to be real, and the party is injured by the negligence, the corporation will be responsible. The converse of this is equally true, and if the apparent danger in the supposed case does not actually exist, but the party, by a change in his position, makes his seeming peril real at a point in the sequence of events, from which reasonable diligence would not save him, then the corporation is not liable, because the injury was not from the original negligence in failing to stop the train, but from the new act of peril committed by the trespasser.

HELM, BRUCE and HELM for appellant.

## POINTS AND AUTHORITIES.

1. When, by deducting one rough estimate of a distance from another rough estimate of a distance between a running train and a stationary object, the remainder is a distance of thirty feet, which at the rate of speed of the train, would be traversed in one and one-half seconds, and on this alone the plaintiff relies to prove a "negligent delay" in giving a signal to stop the train, the court should have peremptorily instructed the jury to find for the defendant, as there is no proof of any facts from which negligence could be inferred. The foundation for the inference being speculation and guesses. (Wintuski's Adm'r v. L. & N., 14 Ky. Law Rep., 580; Hughes' Adm'r v. Cincinnati, &c., R. Co., 91 Ky., 526; Louisville Gas Co. v. Kaufman, 105 Ky., 131; L. & N. v. Wathen, 22 Ky. Law Rep., 85.)

2. When all the witnesses testify that the nature of an object seen lying beside the track was never suspected to be a person until it was too late to stop the train, the court should not submit the case to the jury on the theory that the jury might conclude the real character of the object was discovered sooner than any witness said it was or could have been discovered, (Earley's Adm'r v. L., H. & St. L., 24 Ky. Law Rep., 1808; Goodman's Adm'r v. L. & N., 25 Ky. Law Rep., 1086.)

EDWARD F. W. KAISER, J. W. S. CLEMENTS and ROWAN HARDIN for appellee.

1. The main and practically the only contention of the counsel for appellant is that the verdict is contrary to the evidence. There is no question of law involved. Under our system the jury is the absolute and unqualified trier of the facts of a jury

case. Its province is as complete and unassailable as that of the court to direct it as to the law of the particular case submitted to it.

2. It is a principle of inferential evidence that it is not legal to support a case by an inference from an inference, and the court will observe that learned counsel have failed to draw this distinction in citing authorities.

3. We insist that the question of negligence is always one for the jury.

### AUTHORITIES AS TO PROVINCE OF THE JURY.

L. & N. R. R. v. Graves, 78 Ky., 78; Smith v. Northern Bank, 1 Met., 579; Alexander v. Garrard, 1 Mar., 239; Clay v. Johnson, 6 Mon., 668; Bucklin v. Thompson, 1. J. J. M., 227; Wallace v. Maxwell, 1 J. J. M., 449; McAndre v. Osborn, 5 J. J. M., 530; Griffith v. Dicken, 2 B. M., 24; Letton v. Young, 2 Met., 566; Patterson v. Hansel, 4 Bush, 661; Thompson v. Blackwell, 17 B. M., 624.

### NEGLIGENCE IS TO BE FOUND BY JURY.

L. & N. R. R. v. Creighton, 106 Ky., 42; Becker v. L. & N. R. R. Co., 110 Ky.; Lou. So. Ry. v. Tucker, 105 Ky., 492; Hughes' Adm'r v. L. & N. R. R. Co., 104 Ky., 774; Jenkins v. Same, 104 Ky., 673; Ashland Co. v. Wallace, 101 Ky., 626; Hemstein v. Dupue, 24 Ky. Law Rep., 887; Conadeau v. Am. Ac. Co., 95 Ky., 280.

### LAW OF INFERENCE.

Hughes v. Easten, 4 J. J. M., 573; Wilmuth, Adm'r v. Illinois Central R. R. Co., 25 Ky. Law Rep., 671.

OPINION BY JUDGE BARKER—Reversing.

This action was instituted in the Jefferson Circuit Court to recover damages for the death of Albert C. Hathaway, caused, as is alleged, by the negligence of the appellant railroad company in running over and cutting off his arm, from which injury he died. The answer controverted the material facts of the petition and alleged contributory negligence, which was denied by reply, thus completing the issues in the case. A trial by a jury resulted in a verdict of $3,000 in favor of the appellee, of which the corporation is now complaining.

The facts are these: Albert C. Hathaway, who had been discharged from an employment in Louisville, Ky., for drunkenness, went to Owensboro in search of work. While in that city he was on a protracted debauch, and seems to have left there on a train which passed at 4 o'clock a. m., on the 12th day of June, 1902. At Lewisport, as we understand the record, he left the train, presumably because he had not sufficient money to pay his way further. At the latter place he undertook to, and did raise a small amount of money upon the plea of being a Mason in distress. He was told, however, that at Hawesville, a town some 10 miles distant, there were quite a number of Masons, and if he would go there he could probably obtain more substantial assistance. This he endeavored to do by walking along the track of the defendant railroad. While en route, at one of the stations, he stopped and obtained water to drink. His nerves were very much unstrung, and the section boss who gave him the water advised him not to walk further, but to rest in the shade, as it was very hot. This he declined to do and continued on his way. When within about 2 1-2 miles of Hawesville he seems to have fallen, and lay beside the track his feet somewhat out from the roadbed, near or in some weeds which grew there; his head lying between the ends of the cross-ties, but outside the rail. His hat, which had fallen from his head, was on the track between the rails. Between 1 and 2 o'clock in the day a train of cars loaded with gravel was being backed from the company's gravel pits toward the point where Hathaway was lying. The conductor and colored brakeman were on the caboose, keeping a lookout. The train was running at a rate of about 15 miles an hour. When within about 150 yards of where Hathaway was lying, both the conductor and the brakeman observed him, but

did not know that it was a man, or what it really was.
They watched the object intently, however, and when
they got within four or five car lengths of the deced-
ent they recognized the object to be a man.   Instantly
the emergency signal was given by the conductor, and
it is not denied that from that time on everything that
could be done to stop the train was done, and that it
was stopped within as short a space as was possible.
As the decedent lay, he was in no actual danger from
the cars, and had he remained quiet the train would
have passed him without injury; but about the time
the caboose, which, as said before, was the forward
end of the train, got within 30 feet of him, he spasmo-
dically, as it appears, threw his arm across the track,
and it was crushed off by the wheels of the caboose.
The train was stopped after the caboose  and the
second car had passed the point where he lay.   The
conductor sprang to the ground, and went to the in-
jured man's assistance, who had by this time arisen
from where he lay, and when the conductor approach-
ed him he grasped that officer with his uninjured arm,
and tried to speak, but could only mumble incoherent-
ly.   He was frothing at the mouth, and his face much
flushed.   The conductor at once placed him in the
caboose, and the train was backed to the gravel pits,
where the company maintained a telegraph station,
and a message sent to Cloverport to have a surgeon at
the depot when the train reached there, and then the
wounded man was carried to Cloverport, where he was
placed in charge of Dr. A. A. Simmons, a surgeon of
the defendant company; but he was in extremis and
died five minutes after.   There was little or no hemor-
rhage from the wound; the ends of the arteries being
mashed together by the wheels so as to staunch the
flow of blood.   The appellee, after proving by her

own testimony her appointment and qualification as administratrix, introduced the colored brakeman as to the material facts of the accident, and then rested her case, whereupon the appellant moved for a peremptory instruction in its favor, which was overruled by the court. It then introduced its evidence, showing the facts we have detailed about the drunkenness of the decedent, his physical condition, and his undertaking to walk to Hawesville along the line of its track. It also introduced its conductor and engineer, who testified as to the discovery of the decedent lying near the track, and that everything that could be done to stop the train in time to save him was done. Dr. Simmons testified as to the patient's condition when he arrived at Cloverport, and his death, and also gave it as his opinion that he died, not from the shock of having his arm crushed off, but from sunstroke, apoplexy, or alcoholism, or a combination of these.

The conclusion we have reached as to the merits of the motion for a peremptory instruction renders it unnecessary for us to discuss any other question in the case. Appellee's witness James Dean who was the brakeman on the train at the time the injury was inflicted, states all of the evidence on the merits of her claim for damages. As it must be admitted that at the best there is only a scintilla of evidence of negligence, and that this scintilla must be deduced from the testimony of James Dean, we will set forth accurately what this witness said. In response to the question, "I will get you to state to the jury how it (the injury) happened," he said: "Well, he was laying near the track when we seen him, when I seen him, and we were backing up pretty sharply, and when I first discovered him I could not well tell what it was, whether it was a man, or a bunch of weeds, or

what. The weeds was a little high there where he was laying at the time. When we first seen him, I reckon it was something near one hundred or fifty yards when I first discovered him; something near that as near as I can tell. After getting close to him I discovered it was a man. The conductor asked me what it was at first, and I told him I didn't really know what it was. and after getting closer I says to him, 'It looks like a man,' and after we got within about I couldn't exactly tell how close I could see it was a man, and I told him it was a man. Of course, then, he signed the engineer down, and after I told him it was a man, and he could see it was a man, I suppose he signed him down, and we ran about a couple of cars over him.''

"Q. At the time you saw this object and told the conductor that you thought it was a man, could the train have been stopped in order to avoid running over this man at that time?''

"A. Not at that time.''

"Q. I am speaking of the time you saw this object on the track and you told the conductor about it. Now, if the conductor would have made any attempt to stop the train, could the engineer have stopped the train at that time?''

"A. Well, I don't know whether he could or not exactly. I could not tell you how quick he could stop —nothing like that.''

"Q. How far did the car run after you had told the conductor that you thought it was a man before he tried to stop the car—before the conductor tried to stop the car?''

"A. I don't know exactly how far it ran.''

"Q. About how far?''

"A. Well, I could not tell exactly how far.''

"Q. Had he gone three car lengths or four car lengths?"

"A. Yes, sir; I guess he had, as much as three."

"Q. Had he gone as much as four or five car lengths?"

"A. I could not tell exactly whether it was that much or not."

"Q. Who saw the object first?"

"A. The conductor seen it first."

"Q. Before you did?"

"A. Yes, sir."

"Q. What did he say about it?"

"A. The conductor asked me what was it on the track, and then I looked, and I says to him, 'I don't know exactly what it is,' and he says, 'It looks like a bunch of weeds.' He says, 'It is a bunch of weeds,' or 'what is it?'" That is what he said.

"Q. Did the conductor make any attempt to stop the train after he saw the object on the tract at that time?"

"A. Not at that time; no, sir."

"Q. How far did he run the train from the time the conductor first saw the object on the track and before he tried to stop the train?"

"A. He didn't run very far. I don't know exactly how far it was."

"Q. Well, about how far?"

"A. Oh, it was about, I reckon, as much as four or five car lengths, I guess."

"Q. Before he ever tried to stop the train?"

"A. Before he could tell what it was."

"Q. How far was you away from him when you could tell it was a man?"

"A. It was about, I guess, something near three or four car lengths."

On cross-examination the following questions and answers were given:

"Q. You have said that the conductor signaled the engineer when he found out it was a man?"

"A. Yes, sir."

"Q. Do you know enough about railroading to know what kind of a signal that was he gave, whether it was an ordinary stop signal, or emergency signal?"

"A. Well, yes, sir; it was for a quick stop."

"Q. Did you feel the engineer apply the brakes?"

"A. Yes, sir."

"Q. Have you had enough railroad experience to know whether that was a quick stop he made?"

"A. Oh, yes, sir; he made a good stop."

"Q. How long after the conductor passed the signal to the engineer before you felt the engineer commence to stop the train?"

"A. Well, it was right away, as near as I can tell."

"Q. How close were you on him, if you know, when he threw his arm over the track?"

"A. Oh, we was about a car length of him, when he throwed his arm across the track."

"Q. Did he make any other movement at that time?"

"Q. Did he move his head, or sit up, before your train got to him?"

"A. No, sir; I never seen him sitting up."

As Hathaway was a mere trespasser upon appellant's right of way, it owed him no lookout duty whatever, and was only responsible for any injury inflicted which reasonable diligence on its part, after his peril was discovered would have averted. The question, then, comes to this: When did the peril of the injured man become apparent to the employes of the railroad? Obviously after they knew what the ob-

ject was which they saw lying near the track. That is stating the proposition more strongly for the appellee than she deserves, because it leaves out of view the fact that the actual injury which accrued to her decedent was the result of his moving his arm and placing it across the rail just as the train reached him; the evidence without contradiction showing that, as he lay when first observed, he was in no actual danger whatever, although that fact was not known to the employes of appellant in advance. Assuming, however, for the present, that as he lay he was in peril, does the evidence of Dean disclose any negligence on the part of appellant? This question was, by the trial court, made to hinge upon the fact that Dean stated that, at an appreciable time before the conductor gave the emergency signal, the witness said to him, "It looks like a man;" and it was deduced therefrom that it was for the jury to say whether it was negligence in the conductor to fail to give the emergency signal instantly upon this suggestion being made by Dean. This assumes that the conductor, who was also looking at the object, should have instantly adopted the suggestion of the brakeman Dean and acted upon it, or that he could have done so within the moment of time mentioned. This assumption is predicated upon the estimated rate of speed at which the train was running, and the supposed distance it had run between the time Dean stated, "It looks like a man," and the time when the conductor gave the emergency signal. The witnesses say the train was running at a rate of about 15 miles an hour, and Dean testifies that, within the time under consideration, it had gone as much as three car lengths. Counsel for appellee sought with great diligence to have him extend this distance, but he declined to say that, within this time, they had

traversed more than the length of three cars. Now, assuming it to be true that the train was actually running at 15 miles an hour, it went 22 feet each second. The cars were said to be 34 feet in length. Three car lengths are therefore 102 feet, so that the actual time elapsing between Dean's suggestion, "It looks like a man," and the giving of the emergency signal, was a little less than five seconds. But the witness stated most emphatically that the train could not be stopped in time to save Hathaway after they discovered that the object which had attracted their attention was a man. Unless the rule of law is that those in charge of a train, under circumstances such as we now have before us, must stop it every time they see an object lying near the track which looks like a man, the evidence of Dean does not show any negligence on the part of those in charge of the train in question. When we remember the long distances traversed by trains now operated in this country, and the absolute necessity of their being run on schedule time, both for the safety of the traveling public and the needs of commerce, a rule would bear exceedingly hard upon corporations which requires them to stop their trains to investigate every object lying near their tracks which "looks like a man," And especially would this be true where the object (if a man) was a mere trespasser, to whom no lookout duty was owing. The more reasonable rule, it seems to us, is that the corporation's duty to a trespasser begins when it actually discovers his peril. The conductor in this instance was not obliged to take the mere suggestion of the brakeman that "it looks like a man" as a fixed fact. He was looking at the object himself, and Dean testifies that, after he and the conductor actually discovered that it was a man, everything that was possible to be done to save him was done.

It seems to us that this case can not be distinguished from Goodman's Adm'r v. Louisville & Nashville Railroad Company, 116 Ky., 900, 25 Ky. Law Rep., 1086, 77 S. W., 174, 63 L. R. A., 657. In the latter case the decedent, a boy of 11 years, laid down between the rails on the track of the corporation. A train came along, traveling at the rate of from 30 to 35 miles an hour, and ran over and instantly killed him. The boy was a trespasser upon the track, and the railroad owed him no duty, except to use reasonable diligence to refrain from injuring him after his peril was discovered. When within about 150 yards of him, the fireman, who was looking out ahead, saw an object on the track which appeared to be a piece of paper; but, when the engine had approached to within 30 feet of the object, he discovered it to be the decedent. From that time on everything was done to stop the train before it ran over him. In addition to these facts, evidence was introduced which tended to show that it was possible for the engineer to discover the deceased in time to save him. At the close of the plaintiff's testimony, the trial court awarded the defendant a peremptory instruction to the jury to find for it. The merit of this judgment was the question on appeal, and in the opinion affirming it we said: "In broad daylight he laid down between the rails, and it certainly can not be said that it was negligence in the engineer in charge of the train not to have discovered his position of peril at the very first moment when it might have been discovered by one who went there for the express purpose of ascertaining whether such discovery was possible. Trains must be run on schedule time, and no duty is imposed upon those in charge to stop or slow up at the appearance upon the track of objects the nature of which is only discernible upon near approach."

In the case of Early's Adm'r v. Louisville, H. & St. L. Ry. Co., 115 Ky., 13, 24 Ky. Law Rep., 1807, 72 S. W., 348, there was no actual witness to the killing; but the plaintiff undertook to establish negligence of the defendant corporation by showing that the track at the place where the deceased was killed was perfectly straight for a long distance, and therefrom deducing the conclusion that, had the corporation's employes exercised ordinary diligence, they could have discovered his peril in time to save him.  The deceased being a trespasser upon the track at the point where he was killed, this court, in the opinion, after stating the rule as herein enunciated of the duty of the corporation to a trespasser, said: "We do not attribute to the tests made by some of the witnesses, as to the distances from which certain objects placed by them on the railroad track at the point of the accident could be seen, the importance attached to them by counsel for appellant; for we know that objects to which the attention is called in advance can more readily be seen and identified by a person stationed on the ground at a given distance than by one on a rapidly moving train, however keen his vision, or constant his outlook on the track ahead of the train.  But these tests do not of themselves, or in connection with the remainder of the evidence, supply the facts from which negligence on the part of appellee may be inferred; and, being of the opinion that the lower court did not err in giving the peremptory instruction, nor in refusing the appellant a new trial, the judgment is affirmed."

The opinion in the case of Goodman's Adm'r v. Louisville & Nashville Railroad Company, supra, so thoroughly discusses and distinguishes the cases relied on by appellee to sustain the judgment of the trial court in overruling the motion for a peremptory in-

struction from the case at bar that we think it unnecessary to review them here. Upon the theory that appellee's decedent was in actual peril as he lay near the track at the time he was first observed, we think the evidence fails to show any negligence on the part of the corporation, under the well-settled rule of its duty to trespassers. From the time that its employes knew the object they had heretofore seen lying near the track was a man, there is no dispute that everything was done which could have been done to stop the train, and we do not think the appellant owed the decedent any duty prior to that time.

As a matter of fact, however, Hathaway was in no actual danger of being injured by the passing train, as was demonstrated by the fact that no part of his body was touched except his arm, which he threw across the track just before the train reached him; and there can be no question that it was impossible to stop the train in time to save his arm after he placed it across the rail. The close proximity of Hathaway to the track at the time he was discovered made the employes of the appellant believe that he was in danger, and they acted upon this theory, although, as said before, it later transpired that he was not; and the question arises on this latter phase of the case whether the employes (conceding that they saw him as he originally lay in time to stop the train, and failed to do so) were bound, at the peril of the corporation, to anticipate that a man, lying otherwise safe near the track, would deliberately place his arm upon the rail before the train reached him. It seems to us that the proximate cause of the injury which accrued to Hathaway was this last act of his in suddenly placing his arm across the rail; and if the corporation was not bound to anticipate his presence at the

place of the accident (he being a trespasser), it was not bound to anticipate, after its employes saw him in a safe position with reference to the passing train, that he would immediately imperil himself by placing a part of his body in front of the approaching car. Suppose he had been seen standing so close to the track that it was impossible to tell whether he was in danger as he stood, but it was afterwards found that he was safe; must the corporation anticipate, at its peril, that he would throw himself across the track (if he afterwards did so) in front of the train? It seems to us that this question must be answered in the negative, unless we are to hold that the employes must be endowed with prescience, because it would not be reasonable to suppose that one so standing would make his seeming peril actual by throwing himself across the track. Undoubtedly, if the railroad's employes in charge of a moving train see one in apparent danger by his proximity to the track, and they fail to use ordinary diligence to save him, and the apparent peril is found to be real, and the party is injured by the negligence, the corporation will be responsible. The converse of this is equally true, and if the apparent danger in the supposed case does not exist in actuality, but the party by a change of his position makes his seeming peril real at a point in the sequence of events from which reasonable diligence would not save him, then the corporation is not liable, because the injury resulted, not from the original negligence in failing to stop the train, but from the new act of peril committed by the trespasser.

For the reasons indicated, the judgment is reversed for proceedings consistent herewith.

Judge Nunn dissents from the last half of the opinion, which relates to the decedent placing his arm on the track just before the train reached him.

Petition for rehearing by appellee overruled.