# Louisville & Nashville Railroad Company v. Burch's Administrator.

(Decided November 12, 1913).

## Appeal from Muhlenberg Circuit Court.

1. Witnesses—Expert—Opinion—Competency.—A freight brakeman of only three months' experience, who has never worked on a passenger train or had any experience in applying an emergency brake or in seeing one applied, is not competent to give an opinion on the distance within which a passenger train, going at the rate of 45 miles an hour, can be stopped by the use of the emergency brake.

2. Railroads—Trespasser—Action for Damages—Peremptory Instruction.—In an action against a railroad company by the administrator of a trespasser to recover damages for his death, based on its failure to exercise ordinary care to avoid injuring decedent after his peril was discovered, evidence examined and held sufficient to take the case to the jury.

3. Instructions.—In an action against a railroad company by the administrator of a trespasser to recover damages for his death, based on the failure of the company to exercise ordinary care to avoid injuring him after his peril was discovered, it is not proper to refer in the instructions to the disability or deafness of the trespasser, when the engineer did not know thereof, and it was impossible for him to tell that such was the case.

BROWDER & BROWDER, BENJAMIN D. WARFIELD and C. H. MOORMAN for appellant.

NEWTON BELCHER, R. P. ROWE and BELCHER & SPARKS for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY—COMMISSIONER—Reversing.

On October 28, 1911, Alfred Burch, a coal miner 64 years of age, was struck and killed by a passenger train owned and operated by the Louisville & Nashville Railroad Company. His administrator brought this action to recover damages for his death. The jury returned a verdict in favor of the administrator for the sum of $3,954. Judgment was entered accordingly, and the railroad company appeals.

Burch lived near Island Station in McLean County. On the morning of October 28, 1911, he boarded a train and went to Central City, some ten or twelve miles distant. Reaching Central City, he proceeded to drink rather freely. He procured a dozen bottles of beer, and

placed them in a basket. Failing to catch the afternoon train home, he set out to, walk home along the defendant's railroad track. Meeting two or three persons, he requested them to drive him home. They declined to do so. These persons say that he was intoxicated and staggering down the track. He was struck by fast passenger train No. 1 a few minutes after five o'clock in the afternoon. His body was found a few feet from the track. The basket of beer was sitting near the track. Eleven bottles were intact, and one was broken. One of the decedent's shoes was also found on the track.

For plaintiff Elijah Thurman, 40 years of age, who formerly lived in Tennessee, and who had had about three months' railroad experience ''at one time and then on and off'', testified that he was on the train the day Burch was killed. He saw where the basket was sitting. It was on the right hand side of the track, about six or seven feet from the rails. When the dead man was discovered, he was 65 or 70 feet to the right of the basket and between 63 and 70 feet up the track. Burch had the appearance of having been struck on the right side of the head. When found Burch had one one shoe. The other was on the track. The first thing that attracted his attention that evening was the distress whistle. The engineer first blew the whistle three or four times, and then he opened the whistle again. The engineer did not apply the emergency brakes, but after a long whistle he checked down gradually. He ran 600 feet from the time he started to stop until he stopped. He knew this by counting the rails on the Monday preceding the day he testified. The engineer first began to sound his alarm when the engine and front cars were just across the road crossing. He was also near a two-story white house. This house was about 825 feet from the place where the basket was found. No brakes were applied from the time the engineer first sounded the alarm whistle up to the point where the basket was found. According to witness' best recollection, the train consisted of engine and tender, two passenger coaches and one baggage car. In his judgment, the train, at the speed it was running, could have been stopped in 150 feet. When the accident happened, it was some time between five and six o'clock. On cross examination witness stated that he had had three months' experience as a freight brakeman in Tennessee. He had never worked regularly on a passenger train. The train that struck Burch came around a sharp

curve. The track was slightly down grade. Could not say what speed the train was running when the whistle was first sounded. It was running "pretty pert." The train was in the neighborhood of 175 feet long. He thought they could stop the train in the length of the train. Had seen trains stopped in less distance than 50 yards. He never saw decedent as the train went by. Was sitting on the right hand side of the train, and could not tell at what time the train struck decedent. Could not say exactly how close the train was to Burch when the whistle sounded the last time. After the whistle was sounded he felt the brakes applied on the cars.

Everett Wood testified that he was riding on the smoker of the train that struck Burch. Heard the engine whistle as if something was on the track. Recognized it as an alarm whistle. After the accident he went back to the point where Burch had been struck by the train. Found Burch lying down under the dump. The embankment there was six or seven feet high, and maybe higher. Had been there since and made some measurements. Went there with Mr. Rowe. When the train whistled it was between the road crossing and the white house. Never felt the train begin to check up until after the second whistle. That was about where the basket' was. When it began to slow down they ran about 619 feet. Could not tell if the train was put in emergency. Decedent's body was between 60 and 70 feet from the basket. He appeared to be struck on the right side of his head. On cross examination witness stated that he happened to notice the white house when the whistle sounded. There was a gradual curve at that point. There is a slight cut there. The white house was on the opposite side of the train from where he was. Did not know the speed of the train. There was a short interval between the blasts of the whistle.

Aaron Bates testified that he got on the train at Island Station, and was going towards Central City. Decedent was killed at about a mile and a half north of Central City. Witness was riding in the smoker on the right hand side. Just as he looked out of the train, the train hit the fellow and knocked him off. Decedent was sitting on the right hand side of the railroad. The engineer did not commence to stop the train until after he passed the fellow. He ran 600 feet after he hit him. He found the basket on the side of the track, but it did not have the appearance of having been struck. Decedent

was 60 or 70 feet from the rails. The engine whistled between the big White house and the crossing. That was 825 feet distant from where the decedent was struck. There was nothing there to obstruct anyone's view. On cross examination witness stated he just happened to look out and notice the white house when the whistle blew. He then looked out as soon as he heard the whistle. As soon as he looked out the train hit the man.

Mrs. Sallie Thurman testified that when the alarm whistle was given no effort was made to stop the train.

R. P. Rowe testified that a man could be seen from the point where the train first rounded the curve, and from this point to where the basket was found was 825 feet.

For the defendant, W. B. Ramsey, the engineer in charge of the engine that struck decedent, and who had had 15 years experience as a locomotive engineer, testified that the train was composed of the engine and tender, one baggage car and three coaches. The train was going towards Russellville at the time and was on a down grade and rounding a curve. When he first saw Burch the engine was a little over half way between the white house and where Burch was. At that time Burch was on his hands and knees in the act of getting up. He was about 75 yards distant. The train was running at about 45 miles an hour. Immediately upon seeing Burch he shut off the steam and gave the alarm. When the alarm was given Burch got right up and turned his face towards the engine. When he got straightened up he made a motion back towards the track as if he were going to pick up something. As soon as Burch moved towards the track he gave another alarm whistle and went into emergency. The train was running in the neighborhood of 50 feet a second. When the first alarm was sounded Burch looked right at witness, and witness thought he was going to get off the track. Witness did not know that Burch was deaf in one ear, or that he had been drinking. From the time he went into emergency he ran about 200 yards or a little over before stopping. It was absolutely impossible to stop a train going at that rate of speed in 50 yards. The train could not be stopped within 200 yards. Within 200 to 300 yards would be an extra good stop. When Burch turned and looked at him, he thought Burch was going to get off.

He had no idea that Burch would not get off the track until he started back towards the track. The bumper of the engine struck him. At that point the right of way is 30 feet wide. Burch was found a few feet from the track. On cross examination witness stated that Burch's body was found about 18 feet from the track, and about 12 feet up the track from where he was struck. When he first saw Burch, Burch had both hands on the ground. Did not know whether he was on one knee or both knees. His left knee was next to him. Burch was on the right hand side as you go toward Central City. He first got clear of the track and then went back on the track. Burch tried to pick up something, and when he got straight he was struck. When Burch went back on the track the second time the engine was only about 25 or 30 yards distant. The brakes were then put into emergency. The reason for that was that witness believed Burch was then going back on the track.

Jack Hanley, a fireman, testified that his view of the decedent was obstructed because decedent was on the right hand side of the engine. After the engineer blew the second whistle he put his brakes into emergency.

Sam Mitchell, after having testified to seeing Burch and the fact that he appeared to be drinking, testified that there was about a 30-degree curve just before reaching the point where Burch was struck. There are two cuts at that point, and they are high enough to obstruct the view. Other witnesses testified to having seen Burch, and to the fact that he was intoxicated.

E. B. Tooley testified that he was conductor of the train that struck Burch. He was in the ladies' car. Just as that rounded the curve he heard the alarm whistle, and at the same time the brakes went into emergency. Knows that the brakes went into emergency because of the sudden stop of the train. At that point is a little down grade and a sharp curve. The train was running about 45 miles an hour. The train was about 220 feet long. On cross examination he stated that the distance from Owensboro to Central City was 35 miles, and the time schedule was from 3:45 to 5.13. This, however, included 13 to 14 stops.

Defendant first insists that the court erred in permitting the freight brakeman, Thurman, to testify as to the distance in which a passenger train, going at the rate of 45 miles an hour, could be stopped. We think this

contention is well taken. According to his own evidence, Thurman had had only three months' experience as a freight brakeman in Tennessee. On being asked the question in what distance a train going at the same rate of speed as the train in question could be stopped by the use of modern braking appliances, the court interrupted him and said:

"Q.   What did you say about working on a train?

"A.   I worked about three months.

"Q.   You got that information from working on a railroad, the distance in which a train could be stopped?

"A.   Yes, sir, know a little something about that."

The witness further stated that he had never worked regularly on a passenger train. It is well settled that the distance within which a train can be stopped by the use of emergency brakes is a matter of expert knowledge. To testify as an expert the witness must have special knowledge of the subject of inquiry. It does not appear from an investigation of Thurman's qualifications that he ever applied the emergency brakes on a passenger train, or that he was ever on such a train when the emergency brakes were applied. Without some experience of this kind he was certainly not qualified to testify as an expert. The remarkable answer which he gave, that a passenger train going 45 miles an hour could be stopped within 150 feet, is of itself almost sufficient to show that his experience and observation on the subject of inquiry were not such as to justify the admission of his opinion in evidence. In view of the fact that the question in issue was a close one, and the evidence may have had a controlling effect on the jury, we conclude that it was prejudicial error to permit him to testify on the question under discussion.

Defendant insists that the court erred in failing to direct a verdict in its favor. In this connection much stress is put on the evidence of the engineer, who testifies that he was only 75 yards distant from the decedent when he saw him and blew his whistle; that decedent straightened up and left the track and then returned to the track to get something; that when the witness saw him return to the track he then sounded the whistle again and applied the emergency brakes. Of course if we accept the engineer's statement, it is almost conclusive of the fact that after discovering the peril of the decedent he used ordinary care to avoid injuring

him. However, the engineer's statement is not con-, clusive. While he was the only eye witness to the accident, and his statement with reference thereto is entitled to considerable weight, yet there are other witnesses whose testimony tends to show a different state of case. Their testimony is to the effect that the engineer began to sound his whistle at a point 825 feet distant from the decedent. The engineer himself says that the train could have been stopped within 200 yards. Not only so, but his testimony and that of the other witnesses is to the effect that the train was actually stopped in that distance. The engineer says that after the first alarm was given he went a distance of 50 yards before giving the second alarm and applying the emergency brakes. Therefore, if he was distant 825 feet from the decedent when the first alarm was given, and the decedent was on his hands and knees on the track at the time he was discovered, the engineer might have run 150 feet and then had 675 feet within which to stop the train. Under these circumstances, even though the evidence of Thurman should be excluded, the question whether or not, after discovering decedent's peril, the engineer could have avoided injuring him by the exercise of ordinary care was a question for the jury.

Instruction No. 1, given by the court, is as follows:

"The court instructs the jury that if they believe from the evidence that, after the defendant's engineer saw the deceased, Alfred Burch, on the track on the occasion in controversy, the position or appearance of the deceased was such that an ordinarily prudent person under similar circumstances would have believed that said Burch was disabled in some way or deaf and by reason thereof not about to leave the track, and if the jury shall further believe from the evidence that after this the defendant's engineer failed to use ordinary care to stop the train and avoid striking the deceased, then and in that event the jury will find for the plaintiff."

While there was evidence to the effect that deceased was both intoxicated and deaf, the engineer did not know this fact, and it was absolutely impossible for him, operating an engine several hundred feet distant, to tell that such was the case. For that reason all reference to the disability or deafness of the decedent should be eliminated from the instruction, and the court should merely submit the question whether or not the position

or appearance of the deceased was such that an ordinarily prudent person under similar circumstances would have believed that deceased was not about to leave the track. The same correction will be made in the other instructions.

Judgment reversed and cause remanded for new trial consistent with this opinion.