## Chesapeake & Ohio Railway Company v. Johnson.

(Decided March 5, 1929.)

BROWNING & REED and KIRK, KIRK & WELLS for appellant.

MOORE & CHILDERS and L. J. MAY for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

In this action by Mrs. W. M. Johnson against the Chesapeake & Ohio Railway Company to recover for personal injuries, the jury returned a verdict in favor of plaintiff for $1,000. The defendant appeals.

On the Marrowbone branch of the Big Sandy division of the railroad there is a bridge over Marrowbone creek. This bridge, including the approaches at each end, is about 90 feet in length. On the occasion of the accident appellee was traveling from Wolfpit, a coal town on appellant's road, to her home on Harless creek. When about halfway across the bridge, appellee saw the train coming, and began to retrace her steps. Before she could get off, she was overtaken by the train, and received the injuries of which she complains.

J. E. Johnson testified that he lived about 250 feet from the upper end of the bridge. He was sitting on the

porch and saw most of the accident. His wife hollered about the time Mrs. Johnson was crossing the bridge, and he sprang to the gate to see what was up. He saw Mrs. Johnson turn and start back. There were two men on the front of the cars. One of them got down to the coupler, and the other was on top with his legs hanging over the car. The train overtook Mrs. Johnson at the end of the bridge, and she fell between the curb and the rail. One set of trucks went on by her about 12 feet. Facing down the creek a person can see about 350 feet below the bridge. From Mrs. Johnson's position she had a view down the creek of about 375 feet. He heard the train make a great racket like air brakes when the train was two and one-half or three cars lengths from where Mrs. Johnson fell. He expected it traveled the length of two or three cars after he saw Mrs. Johnson before the air went on. After he heard the noise, the train traveled something like two to two and one-half car lengths. Mr. Hamilton was on top of the car, and the brakeman was sitting on the knuckle or rod at the coupling, and it seemed like he was trying to do something. The air hose is fastened just below the coupler. He could not say positively what the man on the train was doing, as he was trying to watch Mrs. Johnson and the train too. From where the man on the train could have discovered Mrs. Johnson it was from 300 to 350 feet.

Bill Johnson testified that he lived a little over 200 feet from the bridge. He saw the train coming, and the conductor and brakeman on the front car. He saw by their actions that they had discovered something on the bridge. The conductor motioned to the brakeman, and he got down to work the brake on the front end. At that time they were a little over 300 feet below the bridge. He could not say exactly, but they must have gone 300 feet or more before he heard the noise of the brakes. Though he could not see the upper end of the train, it seemed to him that it was near the lower end of the bridge when the brakes took effect. From the time the men were trying to work the air until the brakes took effect the train traveled from 300 to 350 feet. After the brakes took effect, the train ran the length of the bridge before stopping.

Jim Hamilton, the conductor, who was on the front end of the train with the brakeman, testified that the train was equipped with air brakes, which could be applied from where he and the brakeman were located on the

leading car by turning the valve on the air hose. · The air on the train was in good order, and the train stopped immediately after they saw the lady on the track. On the occasion in question he had the brakeman turn the valve. He did not know whether the brakeman had hold of it, or understood the danger, or if he knew exactly what was up, if anything. The brakeman was probably within 2 or 3 feet of the valve. He guessed that he could put his hand on it and turn the air without moving. The train was running at the rate of 12 miles per hour. In his judgment, the train could have been stopped within from 250 to 300 feet after the brakes were applied, although this would depend on all the conditions. As soon as they came around the curve he saw an object, but, owing to the curve, could not tell whether it was on the track or not. Just as soon as they got around to where he could get a plain view of the bridge, he saw it was a person on the track. He then told the brakeman to apply the air. The brakeman applied it, and the air went on. The air went on when the train was probably 50 or 75 feet above the crossing. There is a slight grade from the crossing to the bridge. In the train there were 58 cars, of which 18 were ahead of the engine. The train stopped right even with the far end of the bridge. As near as he could say, he was something like 200 feet away from the woman when he first saw her. He then told the brakeman to apply the air. They did everything they could to stop the train. After he discovered the woman's peril, the train ran from 150 to 180 feet. The air brakes were in good condition.

It is conceded that appellee was a trespasser at the time of the injury, and that the only ground on which she could recover is that appellant's agents failed to use ordinary care to avoid injuring her after her peril was discovered. Therefore, the only question for decision is whether the evidence on that question was sufficient to take the case to the jury. Appellant insists that the opinion evidence of the Johnsons as to what might have been done was not sufficient to make an issue, in view of the positive statements of the conductor, who was introduced as a witness by appellee, and that upon discovering appellee's danger he notified the brakeman, who immediately applied the air. However, as we see it, there is a sharp conflict in the evidence. The conductor says that he was something like 200 feet away when he first

saw appellee. He admits, however, that he was looking in the direction of the bridge as he came around the curve. There was evidence that, had the conductor been looking, he could have discovered Mrs. Johnson when he was from 300 to 350 feet away. There was also evidence that, from the time the men were trying to work the air until the brakes took effect, the train traveled from 300 to 350 feet, and that after the brakes took effect, the train ran the length of the bridge before stopping. It is suggested that this evidence was of little probative value, because the failure of the brakes to take hold may have been due to their defective condition, or to some cause other than unreasonable delay on the part of the conductor and brakeman. This argument loses its weight when it is remembered that the conductor testified that the brakes were in good order, and there is no evidence that the delay was attributable to any other cause. Under the evidence, it is a fair inference that appellee's peril was discovered when the brakeman began working the air. The occasion was one that called for prompt action, and the distance the train ran from the time the brakeman began working the air until the brakes took effect is certainly some evidence that he failed to use ordinary care to stop the train after appellee's peril was discovered. We are therefore constrained to the view that the court did not err in submitting that issue to the jury.

However, the case must be reversed for the court's failure to give a proper instruction on the measure of damages. The jury were told that, if they found for plaintiff, they should award her any sum in damages that you may believe from the evidence that she sustained. It will be seen that this instruction furnished no criterion for the measurement of damages, and was therefore erroneous under the repeated rulings of this court. Chesapeake & O. R. Co. v. Holbrook, 208 Ky. 488, 271 S. W. 583; Kentucky Utilities Co. v. Howard, 203 Ky. 829, 263 S. W. 360; Lexington Ry. Co. v. Herring, 96 S. W. 558, 29 Ky. Law Rep. 794.

Judgment reversed, and cause remanded for a new trial consistent with this opinion.