## Wimsatt's Administratrix v. Louisville & Nashville Railroad Company et al.

(Decided May 27, 1930.)

BARNES & SMITH, GILMORE KEOWN and HEAVRIN & MARTIN for appellant.

KIRK & BARTLETT, GLOVER H. CARY and ASHBY M. WARREN for appellees.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing.

Appellant instituted suit against the Louisville & Nashville Railroad Company, John Whitsell, its engineer, and Moreland Burns, its fireman, in charge of its train at the time of the accident, alleging that the corporation and the individuals mentioned, through their joint and concurring negligence and carelessness in the man-

agement, operation, and control of the engine and train described in the petition ran upon and over Ray Wimsatt, so injuring him that he was then and there killed as the direct and proximate result of the alleged negligence.

The answer denied negligence on the part of appellees and pleaded contributory negligence and assumption of risk on the part of appellant's intestate.

At the conclusion of the evidence offered by appellant, the trial court instructed the jury to return a verdict in favor of appellees, and the propriety of the ruling of the court is called in question by this appeal.

The pleadings and the proof show that the right of appellant to recover is based upon the last clear chance doctrine. At the time of the death of the intestate, he was a trespasser upon the railroad track in a thinly populated community where no lookout duty was imposed upon appellees. Appellees relied upon their affirmative defense, or rather their two affirmative defenses, that, as decedent was a trespasser upon the railroad track, he assumed the risk of injury, and that he was guilty of the only negligence which resulted in his death.

The accident occurred in Ohio county on a line of the appellee railroad company running from Ellmitch in Ohio county to Madisonville in Hopkins county. The date of the accident was April 23, 1929. The train that caused the death of Ray Wimsatt was what is known as a mixed train; that is, it carried both freight and passengers. The accident happened about 2 o'clock in the afternoon, or a few minutes before. The day was bright, and the sun was shining. About two miles east of Hartford there is a cut through which the railroad passes, known as Mitchell's cut. Near the west end of the cut a small creek passes under the line of railroad and is crossed on a short trestle. Westward from the cut is a level straight track for a distance of more than 1,500 feet.

Ray Wimsatt was a young man 34 years of age, the husband of appellant, who sues as his administratrix. He was subject to heart attacks, which came upon him unexpectedly and at times rendered him unconscious. He left his home on the morning of the accident, going to Hartford. He walked on the right of way, as was the custom of the residents in that neighborhood. Having completed his errands in Hartford, he started walking on the railroad track towards his home, and when he had journeyed

about two miles presumably, from the evidence, he had a heart attack which caused him to fall on the railroad track lengthwise between the rails. No one saw him fall, and there is some testimony that a broken bottle was found near the body apparently having contained whisky. The mixed train came out of Mitchell's cut more than 1,500 feet distant from where the body of Wimsatt was lying on the track. The train ran upon and over his body. The speed of the train was not more than 30 miles an hour. It was stopped after the engine, the tender, and two other cars had passed over his body. There were only four or five passengers on the train at the time of the accident. One of them was the drainage commissioner of Ohio county, who was going to his office in Hartford, another was a resident of Dundee, a little station on the railroad, while another was a traveling salesman, and another was a small boy.

The deposition of John Whitsell, the engineer, was taken as if on cross-examination; it was read. He testified that he did not see the man on the track until he was within four car lengths of him, and that immediately upon the discovery of the man he did everything that could be done to stop the train, and he enumerated each movement and step that he took for that purpose. He was evasive in his answers, and made a very poor witness. Many of the questions were answered by the simple statement that he did not know, when the matters inquired about were such as must have been within his knowledge, if not the exact information, that which was sufficiently approximate. No signal was given of the approach of the train after the discovery of the man on the track. If he was unconscious, as was indicated by his prone position on the track, a signal would have proven unavailing, but there is no one who testified that he was unconscious, although the inference that such was the case is probably conclusive.

The most important question for determination is whether those in charge of the train discovered the peril of Wimsatt in time to have avoided injuring him by the exercise of ordinary care. If there was evidence that the peril was discovered in time to have avoided the injury by the exercise of ordinary care, the case was one for the jury, but, if there was no evidence to that effect, the court was right in taking the case from the consideration of

the jury. It was not sufficient to show that the track was level and straight, and that the peril of Wimsatt could have been discovered by maintaining a lookout as he was a trespasser and no lookout duty was imposed upon those in charge of the train. Under the circumstances, it is a question of whether there was an actual discovery of Wimsatt in time to have avoided the injury by the exercise of ordinary care. The rule was so stated in the case of Davis et al. v. Crawford's Administratrix, 203 Ky. 71, 261 S. W. 835, where it was said that no principle of law is better settled than that one sitting or lying upon a railroad track is held to be a trespasser and that those in charge of a train owe him no duty except to use ordinary care to protect him from injury after discovering his peril. Again in the case of Lee's Adm'r v. Hines, 202 Ky. 240, 259 S. W. 338, it was stated that the duty which the law imposes upon railroad companies in favor of licensees will not be extended so as to include persons sitting or lying upon the ties or tracks. The duty referred to was that of maintaining a lookout, giving warning signals, and keeping the train under control. Our opinions go so far as to hold that a person who sits or prostrates himself upon a railroad track, although he be in a place where persons are licensed to use the track, is in no better position than a trespasser, and that those in charge of a railroad train are only required to use ordinary care to protect him from injury after discovering his peril. It was so held in the case of Bevin's Adm'r v. C. & O. Ry. Co. et al., 190 Ky. 501, 227 S. W. 794. The cases are collected in that opinion in which it has been so held.

From where those in charge of a train see an object on the track which they do not at the time recognize as a human being, the rule seems to be that the duty to stop the train does not devolve upon its operators until they discover that the object upon the track is a human being.

This was so held in the case of Spiegle v. C., N. O. & T. P. Ry. Co., 170 Ky. 285, 185 S. W. 1138, 1140. It was pointed out in that opinion that it had been held in other jurisdictions that it is the duty of an engineer in charge of a train, when he sees an object upon the track in time to stop the train before reaching it, to slacken his speed and approach the object with the train under control so that it may be stopped in time to prevent injury if it turns out that the object is a human being. But, in com-

menting on that rule in other jurisdictions, this court said:

"This, however, is not the rule in this state, as it has been repeatedly held by this court that, where trainmen discover an object upon or dangerously near the track and cannot tell what it is and there is nothing in the surroundings to impose the duty upon them to know what it is, the defendant does not have to check the speed of the train and proceed upon the assumption that the object may be a human being."

In the late case of Louisville & N. R. R. Co. v. Ison's Adm'r., 216 Ky. 708, 288 S. W. 668, 669, the evidence showed that the engineer saw an object on the track that afterwards proved to be a man. He could not tell what the object was, and, after he saw it, he was debating in his mind whether it was a hog or dog or some other object. He did not blow the whistle, or ring the bell or apply the brakes in an effort to stop the train until after the engine had run over the object he had seen. The court there said:

"The rule is firmly established in this jurisdiction that, where trainmen discover an object upon or dangerously near the track and cannot tell what it is, and there is nothing in the surroundings to impose the duty upon them to know what it is, the defendant does not have to check the speed of the train, and proceed upon the assumption that the object may be a human being."

In the case of Cincinnati, N. O. & T. P. Ry. Co. v. Reynolds' Adm'r, 102 S. W. 888, 31 Ky. Law Rep. 529, the fireman testified that he and the engineer first saw the object on the track as the engine came over a hill about a half mile away. They could see the object, but could not tell what it was. The train proceeded until it was within 50 or 75 feet of the object, when they discovered that it was a man on the track. This court held that, unless the railroad company was bound to discover that the object which was seen on the track a half mile away was a man, it was entitled to a peremptory instruction.

Another case dealing with the same subject is that of Louisville, H. & St. L. Ry. Co. v. Hathaway's Execu-

trix, 121 Ky. 666, 89 S. W. 724, 28 Ky. Law Rep. 628, 2 L. R. A. (N. S.) 498. The evidence showed that Hathaway had been walking on the track and had fallen and lay beside the track, his head by the end of the cross-ties, but outside the rail. About midday a train of cars approached where he was lying. The train was running slowly. When within about 150 yards of where he was lying, the conductor and brakeman discovered the object, but did not know what it was. They watched the object, and when they got within four or five car lengths of it they recognized that it was a man. Everything was done that was possible after the discovery that the object was a man to avoid injuring him, but he was run over and killed, and this court held that the railroad company was entitled to a peremptory instruction.

In the case of Goodman's Adm'r v. L. & N. R. R. Co., 116 Ky. 900, 77 S. W. 174, 176, 25 Ky. Law Rep. 1086, 63 L. R. A. 657, it was held that the railroad company was not negligent in running over a boy lying upon the tracks in broad daylight, and took occasion to say: "Trains must be run on schedule time, and no duty is imposed upon those in charge to stop or slow up at the appearance upon the tracks of objects the nature of which is only discernible upon near approach."

In the case of Soward's Adm'r v. C. & O. Ry. Co., 208 Ky. 840, 272 S. W. 32, 33, we have another case where a trespasser was killed on a railroad track. In that case the fireman testified that he saw something near the railroad track when he was 400 to 500 feet away. Whatever it was he saw was lying down in the path near the ties. When he got within about 30 feet of the object, he looked out of the window and saw that it was a man in the path. The train struck him almost immediately after the discovery that the object was a man. No signal was given, and no effort was made to stop the train until after it had run over the man. This court stated in the opinion that the evidence did not disclose whether the fireman continued to watch the object from the time he first discovered it until he was close enough to recognize it as a man, or whether he looked away and only looked at it again when he was within about 30 feet of it. The court said:

"His discovery of the object certainly imposed upon him the duty of continuing to observe it to ascertain whether or not it was a human being."

The court held that the case should have been submitted to the jury to determine whether it would accept the fireman's testimony that he discovered the peril of the decedent too late to even try to prevent his injury and death. There was evidence that others some distance away saw and recognized the object on the track as a man, and the question was whether the fireman may not have recognized him as a man in time to have avoided the injury, as he had admitted that he saw him when he was 500 feet away. Another case relied on by appellant is that of Tennessee Central Railroad Co. v. Cook, 146 Ky. 372, 142 S. W. 683, 684. In that case a drunken negro was a trespasser lying on the tracks of the railroad. His peril was discovered by a woman, who advised her husband, who went upon the tracks a distance of about 475 feet from the negro and attempted to stop the train by flagging it with his handkerchief. His signals were ignored, and the engineer and fireman testified that they did not see the negro until after they had passed the man who was trying to flag the train down and at a time when they were not more than 150 or 200 feet from the negro. This court held that the question should have been submitted to the jury, but the opinion appears to be based upon the fact that, if those in charge of the train had heeded the signal of the man trying to flag it down, the injury to the negro could have been avoided. The court in that case said:

> "The law does not impose upon those in charge of railway trains the duty to keep a lookout for trespassers, who may be upon the track in the country, away from public crossings; and hence, in order to hold the company liable for the injury, plaintiff must show, not that those in charge of the train were in a position to see, but either that they did see . . . or were in a position where they could not help but see, the perilous position of the trespasser."

The case of Louisville & N. R. R. Co. v. Bell, 108 S. W. 335, 32 Ky. Law Rep. 1312, is one where a trespasser was on a bridge. She was forced to jump from the bridge, resulting in serious injuries. A verdict in her favor was upheld by this court. It was on the ground, however, that those in charge of the train could not help but see her perilous position. The evidence

showed that the track was straight and that the engineer had a clear view for a distance of several hundred feet. He was looking straight down the track. It was held to be a question for the jury whether the engineer saw the trespasser on the track in time to have stopped the train.

The case of Becker v. L. & N. R. R. Co., 110 Ky. 474, 61 S. W. 997, 998, 22 Ky. Law Rep. 1893, 53 L. R. A. 267, 96 Am. St. Rep. 459, is strongly relied on by counsel for appellant. The question in that case was whether the engineer discovered the peril of a trespasser on a bridge in time to have avoided the injury. It was another case where the facts disclosed that the engineer could not help but see the trespasser, as he had a clear view of the bridge for nearly 1,000 feet. The evidence disclosed that some one in charge of the train was seen to put his head out and look towards the bridge. The court held that the evidence was sufficient to submit the question to the jury whether or not those in charge of the train saw the trespasser in time to have avoided the injury. It was a reasonable conclusion in that case that those in charge of the train actually saw the trespasser. The court in that case said:

> "If the engineer becomes aware of anything lying upon or dangerously near the track, which may possibly be a human being or a valuable animal, he is bound to check the speed of his train so as to enable him to stop in time to avoid injury; and, if injury ensues from his neglect to do this, his sincere belief that the object was worthless is of no defense."

That statement appears to be slightly out of line with the general doctrine announced in the cases cited above, but the court did not have a case before it such as is described in the above quotation. The sole question in the case was whether the trainmen saw the trespasser on the bridge in time to have avoided the injury by the exercise of ordinary care. There seems to be no other pronouncement by this court that it is required of trainmen that they must slacken the speed of the train upon the discovery of an object on or near the track which may prove to be a human being. In the case of Johnson v. Sandy Valley & Elkhorn Railway Co., 181 Ky. 539, 205 S. W. 576, the court announced the true rule, citing many cases to support it. It is to the effect that a railroad company owes no duty to a trespasser except to use

ordinary care to avoid injuring him after the discovery of his peril. The court said:

> "In a case like this, it is not sufficient to show that those in charge of the train might have seen the trespasser, but it must appear that they actually saw him. That they saw him may be established either by direct evidence or proof of facts showing that the circumstances and conditions were such that those in charge of the train could not have failed to see him. Tennessee Cent. R. Co. v. Cook, 146 Ky. 372, 142 S. W. 683. Thus it has been held that evidence that the injured party was on the track, that the track was straight, that the view for a long distance was unobstructed, and that the engineer was looking towards the trespasser was sufficient to take the case to the jury."

Other cases bearing on the question before us and all holding that a railroad company owes no duty to a trespasser until after the actual discovery of his peril are Louisville & N. R. R. Co. v. Horton, 187 Ky. 617, 219 S. W. 1084; Louisville & N. R. R. Co. v. Clemmon's Adm'r, 218 Ky. 808, 292 S. W. 506; Louisville & N. R. R. Co. v. Dooley's Adm'r, 220 Ky. 67, 294 S. W. 810; Chesapeake & O. Ry. Co. v. Johnson, 228 Ky. 296, 14 S. W. (2d) 1059; Cincinnati, N. O. & T. P. & O. Ry. Co. v. Gilreath's Adm'r, 228 Ky. 385, 15 S. W. (2d) 267.

The rule is deducible from the cases cited that a railroad company owes no duty to a trespasser lying upon its tracks until the discovery of the peril of the trespasser by those in charge of the train, and that, after the discovery of the peril, the railroad company, through its agents and servants, owes to the trespasser the same duty that it owes to one lawfully on its tracks, and that means that it must exercise ordinary care to avoid the injury after the discovery of the peril. It is not left alone to the statements of those in charge of the train on the question of the discovery of the peril. Facts and circumstances, as well as direct evidence, may contradict the statement of those in charge of the train that they did not discover the trespasser in time to avoid the injury, and, in every case where the facts and circumstances render the evidence conflicting, it is a question for the jury to determine whether the peril of the trespasser was discovered in time to avoid the injury by the exercise of ordinary care.

It is not required of those in charge of a railroad train that they slacken the speed of the train upon the discovery of some object on or near the track not known to be a human being, but, upon the discovery of such an object, the trainmen should observe it from the time of the discovery until they may, in the exercise of ordinary care, determine whether it is a human being.

It remains to measure the evidence in the case now before us by the rules deducible from the cases cited. There is evidence that the railroad track was straight for more than 1,500 feet after the train emerged from Mitchell's cut and until it reached the body of Wimsatt lying on the track. The day was clear, and the time was between 1 o'clock and 2 o'clock p. m. There was no evidence that either the engineer or fireman was looking ahead. The engineer, whose deposition was read, would not say, but he did testify that he could not see ahead on account of the settling of smoke about the engine. He saw Wimsatt on the track and recognized that it was the body of a man when he was four car lengths from the place where the body was lying. He professed not to know the length of the car, which places him in the anomalous position of stating that the train was about four car lengths from Wimsatt when his peril was discovered and then admitting that he could not even approximate the length of a car. Other evidence tended to show that the length of cars ranged from 45 feet to 60 feet. This indicated that the engineer admitted the discovery of the body on the track when he was about 200 feet distant from it. He testified that he immediately exercised every means that he knew to stop the train, but he is contradicted in this by the testimony of the passengers, who felt no jar in the stopping of the train, and to all appearances, according to their testimony, the train made a natural gliding stop. A witness testified that the engineer, while the body was being removed from under the engine, made this statement:

> "Mr. Whitsell (the engineer) in the presence of two other gentlemen just before the body was removed said when they come out of the cut they discovered the object, and when they discovered it was a man they were too close to stop."

It was admitted by the engineer at the time, and when his admission was a part of the res gestae, that

he and the fireman discovered the object on the track more than 1,500 feet away. The statement of the engineer that when he discovered that it was a human being on the track he was too close to avoid the injury does not have to be accepted as true against the facts and circumstances. When he discovered the object on the track, it is to be presumed that he kept it in view, and a jury may have reached the conclusion that he could not help but discover that it was a human being in time to have avoided the injury by the exercise of ordinary care. When this is coupled with the evidence of the witnesses, who discerned no sudden stopping of the train, the engineer is materially contradicted. He gave no signal of his approach, and does not claim to have given any. The train was running 25 or 30 miles an hour on a level track, and was made up of seven cars. He stopped it, according to his own evidence, in seven car lengths, and he did that without even jarring the passengers on the train. Omitting entirely the statements of the fireman and engineer testified to by Judge Dowell, the facts and circumstances were such as to constitute evidence of substance which authorized the submission of the case to the jury.

There is a question of the competency of the evidence of witnesses who offered to testify that the train could have been stopped within a certain distance. One of these witnesses testified that he had three years' experience in railroading in the capacity of a brakeman, and that he had frequently seen trains start and stop at different places in an emergency and otherwise. He offered to state the distance in which the train in question could have been stopped with safety to its passengers. Another witness had worked as a section hand for appellee for about five years, and he had seen mixed trains such as the one in question stopped many times at stations and other points. Another witness had worked for many years as a track laborer and section foreman, and he had seen trains stopped under such circumstances as existed at the time the engineer admitted that he discovered the peril of Wimsatt. Another witness had worked for another railroad company as a section hand for many years, and was acquainted with the stopping of trains of different kinds with different loads on different grades. Counsel for appellant rely on the cases of Chesapeake & O. Ry. Co. v. Lane's Administratrix, 135 Ky.

76, 121 S. W. 993; Matthews' Adm'r v. L. & N. R. R. Co., 130 Ky. 551, 113 S. W. 459, and Moran's Adm'r v. C. & O. Ry. Co., 176 Ky. 409, 195 S. W. 809, as supporting their contention that the evidence of these witnesses' should have been admitted. Counsel for appellee rely upon the cases of Hurst, Jr., Adm'r v. Southern Ry. Co., 184 Ky. 684, 212 S. W. 461, and Louisville & N. R. R. Co. v. Burch's Adm'r, 155 Ky. 731, 160 S. W. 252, 253. The evidence in the Hurst case was held incompetent by this court solely on the ground that the witness was not shown to have been acquainted with the methods and appliances for stopping trains at the time he testified. It was admitted in the opinion that the distance within which an engine may be stopped was a proper subject for expert testimony, but it was necessary that the witness should have special knowledge of the subject as applied to the facts and conditions, and that the witness that offered to testify in that case disqualified himself by showing that he was not acquainted with the equipment for stopping an engine then in use, and that he had not been on an engine for fifteen years. If his answer, so said the court, had been in accordance with the avowal, the result would have been to permit him to make a mere argument concerning matter about which he had no special knowledge instead of giving an opinion concerning matter about which he was qualified to speak. In the Burch case, the witness who testified had had three months' experience as a freight flagman in Tennessee. He had never worked regularly on a passenger train. He could not state at what rate of speed the train was going when the accident happened. He thought that the train could have been stopped in the length of the train. He had seen trains stopped in less distance than 50 yards. This court held that his evidence was incompetent because he had not had sufficient experience to enable him to testify in what distance a train could be stopped.

The cases mentioned establish a rule to govern trial courts in the admission of such evidence. If those who have been engaged in working for railroads have frequently seen trains stopped and have observed the distance in which they could be stopped, and this observation has been sufficiently frequent for the witnesses to deduce substantial knowledge as to the distance, we see no reason why they may not express an opinion on the subject. They must show that they have special knowl-

edge that gives some value to their opinion, or the evidence should not be admitted. It is a close question as to whether the evidence offered was competent. Probably some of it was and some of it was not, but, since the judgment must be reversed for other reasons, if the evidence is offered again, witnesses will be so examined as to determine whether they have special knowledge on the subject.

It is suggested by counsel for appellee that the evidence would have been of no value if it had been admitted, because it would have been in contradiction of the physical fact that the train was stopped with best effort possible within a distance of 280 feet. It is true that expert evidence is insufficient to contradict certain established physical facts. Louisville, H. & St. L. Ry. Co. v. Jolly, 90 S. W. 977, 28 Ky. Law Rep. 989; Kentucky T. & T. Co. v. Roschi, 186 Ky. 371, 216 S. W. 579; Kentucky T. & T. Co. v. Brackett, 210 Ky. 756, 276 S. W. 828. But if the evidence had been admitted it would not have contradicted a certainly established physical fact because it was not shown without contradiction by the engineer that everything was done which could have been done by the exercise of ordinary care to stop the train, as the evidence of the passengers that the train stopped without any sudden jar was proof tending to show that the emergency brakes were not applied. It it true that the evidence of the passengers was not harmonious on this point, as one of the passengers testified that the train stopped suddenly, but others testified differently. This opinion is already too long. Therefore we will not discuss in detail the evidence which was offered relating to the admissions made by the appellees Whitsell and Burns, before the county judge. These admissions were not competent against the railroad company, but under the general rule ofttimes stated, that "an admission of any material fact made by a party to the litigation against his own interest, may be shown against him by the adverse party," the evidence was competent as against Whitsell and Burns.

Upon consideration of the whole case, we have reached the conclusion that the court erred in taking the case from the jury.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.