## Cincinnati, New Orleans & Texas Pacific Railway Company v. Webber.

(Decided December 4, 1917.)

### Appeal from Kenton Circuit Court.

1. Damages—Negligence—Proximate Cause.—One who claims damages because of injuries alleged to have been inflicted through the negligence of another must prove some negligent act on the part of the other which was the proximate cause of the injury.

2. Master and Servant—Negligence—In an action for damages against a railroad company for injuries charged to have been negligently inflicted by a train running over plaintiff, where the physical facts and the testimony of those in charge of the train show that the accident could not have been prevented by the exercise of ordinary care, expert evidence that the result should have been different cannot be allowed to override the facts themselves, for mere opinions must always give way to established facts.

3. Master and Servant—Personal Injuries—Evidence.—Where plaintiff, a flagman, fell on the track almost immediately in front of the engine, which was seen by the fireman, and he at once notified the engineer to put on the emergency brakes, which was done, and yet the train was not stopped in time to prevent injuring plaintiff who did not have time to get up from his fall, although not injured thereby: Held, that this testimony fortified by the physical facts could not be overcome by expert opinion evidence to the effect that the train could have been stopped sooner.

GALVIN & GALVIN, JOHN GALVIN, MAURICE GALVIN and EDWARD COLSTON for appellant.

MYERS & HOWARD for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

This is an appeal by the appellant, who was defendant below, from a judgment recovered against it by the appellee, who was plaintiff below, for the sum of $12,000.00 in a suit brought by plaintiff against defendant in which plaintiff alleged that he was a flagman for the defendant, a railroad company, engaged at the time in interstate commerce, and that through the negligence of defendant's servants engaged in operating a train it was caused to run over plaintiff, injuring his right leg to such an extent that it had to be amputated just above the knee, and inflicting upon his body other more or less serious injuries.

The answer was a denial, followed by a plea of contributory negligence, which, being controverted, formed the issues.

We are asked to reverse the judgment because it is insisted (1) that the court should have given a peremptory instruction to find for the defendant, as was requested by it; (2) incompetent testimony permitted to be introduced by plaintiff over defendant's objections; and (3) error in instructing the jury.

We have given the record, as well as briefs of able counsel, thorough and close consideration, and under the

facts disclosed, supported by numerous decisions from this court, we are forced to the conclusion that the defendant's motion for the peremptory instruction should have been sustained. To understand the reasons for this conclusion it is necessary that a brief statement of the facts be made.

The accident occurred about three-fourths of a mile or a mile south of Georgetown, Kentucky, and some three or four car lengths south of the southern end of a switch or side track constructed at that place. The main line of defendant's track at that point is a single one. Plaintiff was what is known as a head brakeman on freight train No. 62, going north from Danville, Kentucky, to Cincinnati, Ohio. The train consisted of 37 loaded freight cars, a caboose, an engine weighing one hundred tons, and a tender. It had left Danville about 3 o'clock p. m. on August 29, 1915. It had been raining considerably all day, but in the late afternoon the rain had been reduced to what the witnesses say was a drizzle. The train had orders to take the side track referred to for the purpose of letting a fast passenger train go by on its trip south. Up to something like a mile or a little less from the switch approaching from the south the train had been traveling at a speed of between twenty and twenty-five miles per hour, but at that point its speed was reduced, and by the time the train was within seven or eight car lengths from the south end of the switch its speed had been reduced to between four and five miles per hour, according to plaintiff and all of the other witnesses for both parties. In approaching the switch from the south there is a slight up grade, and it was the duty of the head brakeman, such as plaintiff was, to open the switch.

He had worked for the defendant for a number of years, and knew exactly what his duties were in this regard, and he testified, as did all the other witnesses, that it had been and was a universal custom for the brakeman to leave the engine in which he rode, and where plaintiff was riding at the time, while the train was in motion as it approached the switch, and to run ahead of the engine and throw the switch so as to enable the train to take it without passing beyond it and having to back up; and, further, to enable the train to take the switch without having to stop to have it opened. The lever with which the switch is thrown is on the west side of the main track going north, while the switch and the switchboard are upon the east or right hand side of the track going north. On either side of the track just south of the switch

there is a small ditch something like two and a half or three feet lower than the top of the rails and running within two or three feet from the ends of the ties.

On the occasion in question the conductor, engineer, fireman and plaintiff were riding in the cab of the engine, the two former being on the right hand side and the latter two on the left hand side. Without saying anything to anyone, and in obedience to his duties, when the train got within six or seven car lengths of the south end of the switch, traveling at the speed mentioned, the plaintiff got off the engine on the left hand side and started up the track towards the lever of the switch on that side for the purpose of throwing it so as to let the train in on the side track. According to his testimony, he had traveled, after alighting from the cab, about two car lengths, most of the time in the ditch on that side of the track. Finding that it contained some water and mud, he concluded to go upon the track in front of the engine, and in his effort to mount the track, on account of the mud which he had gotten on his shoes, he slipped and fell upon the left hand rail, resulting in the engine running over him and inflicting the injuries for which he sues.

In the petition complaint is made and negligence asserted because of the unsafe condition of the ditch, but this was finally abandoned and the only claim made upon the trial or argued here is that the agents and servants of the defendant operating the engine in question failed to exercise ordinary care to stop the train after the perilous condition of plaintiff was discovered, or, as they insist, could have been discovered by the exercise of ordinary care.

In considering the case we have not deemed it necessary to determine whether the defendant's agents and servants owed plaintiff a lookout duty; i. e., whether they should have exercised ordinary care to discover his peril, because the undisputed facts show that the fireman saw him fall and was at once made aware of his peril. Our discussion, therefore, will be confined to the testimony bearing upon the issue of the care exercised by defendant's agents and servants to stop the train after plaintiff fell. Involved in this is (a) the distance between the engine and the point where plaintiff fell; (b) could the train with the appliances at hand, by the exercise of ordinary care, have been stopped within that distance? and (c) did the agents and servants in charge

of the train exercise or fail to exercise such care to stop the train?

Upon the point (a) plaintiff testified that after alighting from the train he went about two car lengths before he attempted to get out of the ditch and on the track. He is asked: "Q. Now, then, when you ran forward I understood you to say two car lengths before you got on the track? A. Yes. Q. You didn't run any further than two car lengths? A. To the best of my knowledge. Q. Is it your judgment, from the time you got off the engine until you left the ditch to get on the track you ran two car lengths? A. Yes. Q. That would be eighty feet, figuring; you said that a car would average forty feet; so from the time you got off the engine until you left the ditch and started up on to the track you had run eighty feet? A. Yes."

The plaintiff says that the engine is between twenty-five and thirty feet long, while the engineer says it is about thirty-five feet long. Assuming it to be thirty feet, plaintiff had gotten only fifty feet in front of the engine (since it had to be passed by him) according to his own testimony, when he started from the ditch, up the embankment to the track, not allowing any distance to be covered by the train, which was moving at the rate of four or five miles an hour, which would be about six and one-half feet per second, if the speed were only four miles per hour, and about seven and one-third feet per second if it were traveling five miles per hour. While it is not shown by any testimony how long it would have taken plaintiff to travel with mud on his feet the eighty feet, we do not see how it was physically possible for him to have covered that distance in a shorter time than fifteen feet per second, and if the train were traveling only four miles per hour it would have gone in that time a little more than thirty-three feet, which, allowing for the length of the engine, would have made its front end only seventeen feet from the place where plaintiff fell.

The fireman says that the distance ahead of the engine where plaintiff fell could not have exceeded twenty feet. It is true the plaintiff says that he thinks when he started to go out of the ditch he was perhaps as much as a car length and a half in front of the engine; this might be true, although it is speculative on his part, still it necessarily took some time for him to get out of the ditch up the embankment on the track, and to slip and fall, during which time the engine was moving toward him. So, however, we analyze his testimony, as we have done,

we have the result as indicated, that he was no doubt less than twenty feet ahead of the engine when he fell.

Since points (b) and (c) are so closely associated, we will consider them together. It is seriously insisted, and in fact is the only point upon which the judgment is asked to be sustained, that under testimony introduced by plaintiff the train could have been stopped in time to prevent plaintiff's injury. Plaintiff himself says that if the emergency brakes had been immediately applied at the time he fell the train could have been stopped within twenty feet. He introduced two witnesses of more or less experience as railroad men, and whom we think qualify as experts, who say in substance that according to their opinion this train, considering its length, weight, and other existing conditions, traveling at the rate of four or five miles per hour, could have been stopped between five and ten, or possibly at the outside, fifteen feet. One of these witnesses, which is the substance of what the other said, was asked: "Q. I mean when he (engineer) gets ready to make it (emergency application) when he is called upon to make the application? A. I don't know how long it takes him to make it. Q. Your testimony is, if the application is made and it takes hold the train could be stopped in that distance? A. Well, I am telling you; just what I tell you, the brakes go on instantly. Q. Well I know it takes some time for the engineer to reach for the brake and pull it, doesn't it? A. Well, I ain't answering that question. Q. I want you to? A. Of course, it takes time, I am not saying about the time it takes to put it on, I am talking about when he does put it on."

From this, as any ordinarily intelligent person knew without it, it is shown that it takes some small space of time for the engineer to think and act after he receives information to do so. The plaintiff was not injured by his fall, and yet he did not have time to get up before he was overtaken by the engine. The engineer did not see plaintiff fall, but the fireman did, and immediately said to the engineer, "Swipe the gauge," which is explained to mean to put on the emergency brakes. As soon as this could be done, according to the uncontradicted testimony of the fireman, the engineer and the conductor, the emergency brake was applied, but the momentum of the heavy train prevented its being stopped in time to avoid the accident.

It must not be forgotten that the question here is not whether the brakes were in working order or whether

there was sufficient air to have instantly clamped the brakes to the wheels of the train, but it is whether the engineer immediately used all the means at his command to stop the train. We have the testimony of the three witnesses in the cab to the effect that he did do that, and opposed to this are the opinions of plaintiff and his two expert witnesses that the train might have been stopped in time to have saved him after the brakes had been applied, which makes no allowance for the time necessary for the engineer to be informed and afterwards to act.

A case which we consider peculiarly applicable here is that of Louisville, Henderson & St. Louis Railway Company v. Jolly's Admr., 28 Ky. Law Rep. 989. In that case the train was running at a much greater rate of speed than the one here involved. It ran 670 yards after the brakes were applied. The defendant's witnesses therein testified that everything was done that could have been done to stop the train, just as defendant's witnesses testify here. In that case plaintiff introduced two engineers who testified that "such a train might be stopped in three or four hundred yards," and it was insisted that this testimony had the tendency to contradict the engineer and entitle the case to go to the jury, but the court said that "There would be great force in this, were it not for the positive testimony of the engineer, and all the other witnesses on the ground, to the effect that the engineer shut down his engine and applied his brakes as soon as the section foreman signaled to him," and the court found that such positive testimony with the physical facts could not be overcome by the testimony of the absent expert witnesses. The language used by this court in that opinion in discussing the facts is so pertinent to the facts found in this record that we take from the opinion this excerpt:

"It was a very heavy train. It was pulled by a very heavy engine. The failure to stop the train as quickly as estimated might be due to the condition of the brakes, or the failure of some part to work properly, or to the fact that the train was running faster than estimated, or that the witnesses in estimating the distance in which the train might be stopped did not make sufficient allowance for the speed and weight of this train. However this may be, where the physical facts are established, expert evidence that the result should have been different cannot be allowed to override the facts themselves, for mere opinions must always give way to established facts.

The fact is that the train did not stop until after it had struck Jolly. The fact is, according to the evidence, the engineer as soon as he saw the man on the track shut off his engine and set the brakes. There was nothing else he could do. There is no evidence that he omitted anything after he saw Jolly on the track that he could have done. It is conceded that he stopped his train in six hundred and seventy yards, which was about the distance the train would run in half a minute at forty miles an hour. It is evident that when the section boss signaled to him some seconds must elapse before the engineer could shut off his engine and set the brakes. It must also be evident that when so heavy a body was rolling on a smooth surface forty miles an hour, several seconds must elapse before the brakes would have an appreciable effect on the rapidly revolving wheels, and that the greater the speed of the train and the greater the weight, the longer this would be. The engineer can only be expected to exercise such care and promptness as may be reasonably used by a man of ordinary prudence under the circumstances."

After discussing the duty of those in charge of the train, and the care which they should exercise, and when the exercise of such care should commence, the opinion finally says: "The law does not look to bare possibilities. It requires no more of the human machine than may be reasonably expected of it under the circumstances. When all the evidence as to what was done by those who witnessed the transaction is to the effect that the engineer did everything in his power, and there is no evidence that there was anything omitted which he should have done, the bare opinion of experts that the train might have been stopped sooner than it was stopped can not be said to contradict the witnesses as to the physical facts."

The doctrine of the Jolly case is referred to and approved in the cases of Revnolds' Admr. v. C., N. O. & T. P. Ry. Co., &c., 148 Ky. 252; L. & N. R. R. Co. v. Benke's Admx., 164 Ky. 798; and L. & N. R. R. Co. v. Stokes' Admr, 166 Ky. 142.

Under a similar state of facts wherein it was insisted that the testimony of experts should be allowed the effect of contradicting the positive testimony of the engineer and those in charge of the train so as to create a submissible issue, this court in the Stokes case, *supra*, said:

"Unfortunately, too, men do not think and act in an emergency with the same dispatch with which others, in

their calmer moments and who are free from the excitement of the occasion, think they should have acted. It necessarily took some time for the decedent to fall to the concrete and roll under the train. It took some time for the conductor to realize and appreciate the peril in which he was thus placed. It took some time for him to decide on what was best to be done. It took further time for him to mount the steps and reach the bell cord. It took further time for him to give the proper signal to the engineer. It took further time for the engineer to think and act. It took further time for the train to stop after the engineer had acted. It seems to us, therefore, that the statements of the witnesses that a particular thing could have been done instantaneously, or another thing in a second or two, or that the train could have been stopped in from 8 to 10 feet, are mere speculations, based on what might have possibly happened if all the participants were apprised beforehand what would take place, and the verdict of the jury, founded on such statements, is mere guesswork. Neither courts nor judges are authorized to indulge in speculation or guesswork as to the cause of accidents. To authorize a recovery there must be some tangible evidence from which it may fairly be inferred that the defendant was guilty of negligence, and that such negligence was the proximate cause of the injury.''

We do not mean to hold that if the physical facts are such as to show the probable falsity of the engineer's testimony that the latter should notwithstanding prevail. But in cases like the instant one, where the physical facts sustain the positive testimony of the engineer, the conductor and the fireman, no case which we have been able to find permits the speculative statements of experts to overcome it.

In this case, in order to give the expert testimony the weight contended for, it must be assumed that the plaintiff was strictly accurate when he testified not only as to the distance which he traveled after alighting from the train, but he must have been precisely accurate when he said that he was as much as the length of a car and a half ahead of the engine when he got upon the track. This, too, in the face of the fact that an analysis of his testimony will demonstrate, as we have shown, that he was incorrect in that statement.

Moreover, there is in this case the uncontroverted physical fact that the engine was upon plaintiff before

he had time to get up from his fall, although he was not hurt thereby.

. Under the authorities, *supra,* and many others which might be found, there is no escape from the conclusion that there was an utter lack of negligence shown on the part of defendant's agents. We fully appreciate the great loss which plaintiff sustained, and being human our sympathies go out to him. This, as stated, has caused us to give the record and the case close scrutiny. But, in view of the law as we find it, we are forced to hold that this was an unfortunate accident for which the defendant is not liable, inasmuch as the evidence fails to show that it violated any duty which it owed to plaintiff.

We are therefore compelled to hold that the court should have sustained the motion for a peremptory instruction, and for having failed to do so the judgment should be and is reversed, with directions to proceed in accordance with this opinion.