## Kentucky Traction & Terminal Co. v. Roschi's Administrator.

(Decided November 14, 1919.)

### Appeal from Woodford Circuit Court.

1. Railroads—Injuries to Licensees or Trespassers in General—Negligence.—At a place where there is no duty of lookout and it is not claimed any appliances on a traction car were defective, and the decedent himself was negligent, in the absence of evidence that the motorman, after discovering decedent's peril, could have stopped the car with the means at hand in time to avoid injuring him, there is no proof of negligence and a verdict should be directed for the defendant.

2. Railroads—Injuries to Licensees or Trespassers in General.— Where the evidence, without contradiction, proves the motorman, as soon as he discovered decedent's peril, did everything in his power to give warning and stop the car before striking deceased, a diversity of opinion as to how far this occurred from the place of the accident is immaterial within the limits fixed by the witnesses.

3. Railroads—Injuries to Licensees or Trespassers in General.— Where the evidence of several witnesses shows without contradiction that the motorman exercised ordinary diligence to stop the car as soon as he saw decedent's peril, but that it did not stop in time to avoid injuring him, the opinion of experts that the result should have been otherwise is insufficient to contradict such evidence and the physical facts, but tends to prove only that the brakes, etc., were applied at the lesser distance from

the accident, as fixed by some of the witnesses rather than at the greater distances fixed by others.

4.  Railroads—Injuries to Licensees or Trespassers in General—Instructions.—Where there is no evidence the peril of decedent existed or could have been discovered sooner than it was admittedly discovered by the motorman, it was error to include in the instruction submitting the last clear chance doctrine the idea that it might have been sooner discovered.

WALLACE & HARRIS for appellant.

FRANKLIN & TALBOTT and A. H. NUCKOLS for appellee.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

On December 28, 1916, about noon, plaintiff's intestate was struck and killed by one of defendant's interurban traction cars, and his administrator has recovered in this action a verdict and judgment for $12,900, which defendant seeks to reverse for several alleged errors.

Decedent was walking beside his team and wagon loaded with tobacco on the turnpike going from Versailles to Lexington when for some reason not explained in the evidence the team turned abruptly from the pike on to the tracks of defendant which parallel the pike, and stopped with the front wheels of the wagon in the ditch which separates the roadway from the railroad tracks. The horses' heads and parts of their bodies were on the track, upon which a car was approaching in plain view at twenty-five to thirty-five miles an hour from the opposite direction and down grade. Decedent, in an effort to save his team, got in front of it on the track, took hold of the horses' bits or bridles, and tried to back them off the track, never once looking in the direction of the approaching car and seemingly oblivious of his own danger. The car sounded its whistle continuously for some distance before it struck decedent and stopped in about a car length thereafter.

That deceased was guilty of negligence is plain, but whether or not the defendant is nevertheless liable for his death under the last clear chance doctrine is the main question involved. The motorman introduced by plaintiff stated that he saw deceased's team, when it turned on the track ahead of him, and immediately sounded the danger signal by blowing his whistle in continual short blasts, put his brakes in emergency and reversed the motor on the car; that he did everything he could with the appli-

ances at hand to stop the car before a collision.   Whether or not there is any contradiction of this evidence is determinative of whether or not defendant is liable, because under a long line of decisions, unless there was evidence to prove that defendant after discovering decedent's peril could have stopped the car with the appliances at hand it was guilty of no negligence and entitled to the asked for peremptory instruction.   L. & N. v. Stokes' Admr., 166 Ky. 142; Lapp v. L. H. & St. L. Ry. Co., 178 Ky. 647; 199 S. W. 799; Creager's Admr. v. I. C. R. Co., 134 Ky. 543; C. N. O. & T. P. R. R. v. Webber, 178 Ky. 171, 198 S. W. 756; L. & N. R. Co. v. Weiser's Admr., 164 Ky. 23, 174 S. W. 734.

There is no evidence whatever that decedent was in a position of peril before the motorman sounded the distress signal, whatever the position of the car when that was done, although there is quite a difference in the testimony of the several witnesses as to how far the car was from the place of the accident when the distress signal was first sounded.   Every witness who testified upon this question had his attention attracted to decedent's peril by the sounding of this signal, except the motorman and two witnesses, the conductor and J. L. Childers, and these three witnesses agree that just as soon as decedent's team turned on to the tracks the signal was given; so, not only is it proven without contradiction that the motorman gave the signal as soon as he discovered decedent's peril, but that he could not have sooner discovered it because it did not sooner exist.   If therefore immediately thereafter the motorman, as both he and Childers testified, turned off the current of electricity, put the brakes on in emergency and reversed the motor which he stated and no one denied was all he could do to stop the car with the appliances at his command, not claimed to have been defective, it is quite immaterial whether this occurred at about 1,000 feet, or 300 feet, or some intervening point, from the place of the accident, as variously fixed by witnesses, or that three experts testified for plaintiff that the car could have been stopped in less than the distance between the place of the accident and where some of the witnesses say the car was when the signal was first given.   L. & N. v. Stokes' Admr., *supra;* C. N. O. & T. P. R. v. Webber, *supra;* Ky. Traction & Ter. Co. v. Humphrey, 168 Ky. 611, 182 S. W. 854.

We may, therefore, disregard entirely the conflict in the evidence about where the distress signal was first sounded and direct our attention at once to the evidence as to what the motorman did to stop the car at the time and after he sounded the distress signal, which, alone, fixes the time when he should have acted to stop the car as quickly as was possible, having due regard for deceased's peril and the safety of his passengers. And if he so acted the defendant is not liable for the death of decedent, notwithstanding some expert evidence that the car could have been stopped in a less distance than intervened between the place the signal was given as fixed by some witnesses and where the accident occurred, because the expert evidence is insufficient to contradict the certainly established physical fact that the car would not stop, provided everything was done that could have been done to make it do so, and is effective only to prove that the signal was not given at the greater distance from the place of the accident, and to corroborate other witnesses who fixed the place of the car when the signal was given much nearer the place of the accident.

Seven witnesses were questioned as to what the motorman did toward stopping the car to avoid the accident, and as this is the vital question in the case we shall quote this evidence rather fully; and as only two of the witnesses profess to have seen and understood his actions we shall begin with them although one was the motorman, introduced by plaintiff, and the other, John L. Childers, introduced by the defendant:

Joe Speaks, the motorman:

Q.—When you first saw the first movement of this team turning toward the track what, if anything, did you do? A.—I commenced trying to stop. Q.—Did you do anything else? A.—I put the brakes in emergency. Q.—Did you do anything with the whistle? A.—I blew the whistle. Q.—How long did you continue to blow the whistle? A.—Until the collision. Q.—When did you cut off your current? A.—As soon as I seen the horses turn into the track. Q.—Explain to the jury, to put your car in emergency what do you have to do? A.—Push a brake lever over into emergency. Q.—What kind of an instrument is it? A.—Just a little handle about six or seven inches long. Q.—How long does it take you to push that over and set the brakes in emergency? A.—Just an in-

stant,—that quick (demonstrating.)   Q.—When you have pulled that over as far as it will go is that all you can do? Does that set the brake as tight as it can be set?   A.—Yes, sir.   Q.—Is there anything else you can do other than setting that brake by pushing that little lever over?   A.—No, sir.   Q.—And when do you say you did that, with reference to when you first saw the horses turn toward the track?   A.—I cut the current off and set the brake in emergency.   Q.—Did you do that before those horses were on the tracks?   A.—Yes, sir.   Q.—You said as you saw this team make its first turn toward the track you cut off the current and set the car into emergency, and continued to blow the whistle until the collision?   A.—Yes, sir.   Q.—Did you do anything else toward reversing the car?   A.—Yes, sir.   Q.—When did you do that?   A.—After I set the brakes.   Q.—That was what distance from the point of the accident?   A.—About 300 or 325 feet.   Q.—At the time when you first saw this team turn into the track you say your car was running about thirty to thirty-five miles an hour?   A.—Yes, sir.   Q.—Could you, with the means at your command, stop that car, running at the speed at which it was running, in the distance from the time you first saw it to the point of the accident?   A.—No, sir.

John L. Childers:

Q.—What is your business?   A.—Agent for the Fleischman Yeast Company.   Q.—Have you any connection with the traction company?   A.—None whatever. Q.—On Dec. 28th, last year, were you on an interurban car which struck Mr. Roschi and his team of horses on the Versailles pike?   A.—I was.   Q.—What part of the car were you in?   A.—In the smoker, standing to the left of the motorman.   Q.—Do you know this motorman, Joe Speaks?   A.—Yes, sir.   Q.—Which way were you looking?   A.—Straight forward.   Q.—As this car was coming down this hill did you notice anyone or see any wagons, any tobacco wagons?   A.—I noticed two.   Q.—Where were the wagons when you saw them?   A.—Coming down the (opposite) hill from stop 20.   Q.—They were meeting the car?   A.—Yes, sir.   Q.—State to the jury what was the first thing that attracted your attention to that wagon out of the ordinary or changing its course.   A.—The team suddenly swerved to the right.   Q.—To the right?   A.—I meant to the left.   Q.—In the direction of the car track? A.—Yes, sir.   Q.—Which way were you looking at the

time? A.—Straight forward. Q.—At the time you saw this team make its first movement to the left and toward the track, state to the jury if you saw what, if anything, the motorman was doing. A.—He shut off his current and applied his brakes and then began blowing his whistle. Q.—What did the motorman do, if anything, with reference to the whistle from the time he first began blowing it until he reached the point of the accident? A. —He blew it continuously.

James Adams:

Q.—Mr. Adams, were you on the car of the Kentucky Traction and Terminal Company going from Lexington to Versailles on December 28, 1916, which car struck and killed Adam Roschi? A.—Yes, sir. Q.—When you got on the car in what part of same did you take your seat. A.—In the front part of the car, in the smoker. Q.—Is the smoking compartment of the car the same place where the motorman stands that runs the car? A.—Yes, sir. Q.—Was anyone sitting on the same seat with you, if so, state whom? A.—Guy Bartlett was sitting beside me. Q.—What, if anything, first attracted your attention to anything being wrong, or anything being on the track? A.—It was Mr. Bartlett stated to me, says "there must be something on the track," and I looked up and I seen Mr. Roschi and his team on the track; he had hold of each horse's bit, trying to shove them back off of the track. Q. —In order to avoid any confusion, please state to the notary again what first attracted your attention to something being wrong on the track? A.—It was the whistle was blowing and I looked up and I saw Mr. Roschi and his team on the track, and he had hold of each horse's bit, trying to push them back off the track. Q.—What was the nature of the blowing of the whistle which you refer to? A.—He kept jerking the whistle as fast as he could. Q.—When you first heard the blowing of the whistle which you have spoken of, where was the car at that time with reference to the man on the track? A. —Well, it was coming around—going down the hill. Q. —Please state to the notary, if you know, what was the condition of the track approaching and near the point of the accident. A.—Well, it was down grade, a valley and then up a hill. Q.—Where was the car when it commenced blowing the whistle in reference to the valley which you have spoken of? A.—Well it was near the valley. Q.

—Describe the conduct of the motorman from the time the whistle first commenced to blow up until the man was struck by the car, and immediately afterwards. A.—Well he was blowing the whistle, and he seemed to put the brakes on after we were near the flat, and kept blowing the whistle, and when he seen he was going to hit the man, after he hit him he jumped up and down and says, ''My God, why did not that man get out of the way?''

Cross-examination: Q.—I will ask you if you did not say ''I saw the motorman apply his brakes, and after he seemed to do all he could to stop the car he jumped up and down and hollered, ''My God, why don't that man get out of the way?'' A.—I saw him put on the brakes but it did not jar the car. Q.—Now then, there was something said to you about the motorman being excited. You do not mean to infer by that, by your answer in the direct examination, that the motorman did not do all he could to stop his car? A.—Well, did not I state to you that the motorman was excited, he put the brakes on—he did not jar the car any, thrown anybody out of the seats. Q. —You did see him apply his brakes? A.—I did. Q.—You did see him do several things did you not, to stop his car? A.—I seen him apply his brakes, I'll say that.

Re-direct examination:     Q.—Mr. Becker several times asked you the question if the motorman did not do all in his power to stop the car; you do not mean to say by that statement that he could not have commenced earlier to stop the car than he did, do you? A.—Well, he did not commence right at the time, no, he did not.

Re-cross examination: Q.—You were not looking at the motorman? A.—Oh, I was watching the motorman, yes, I seen the man on the track and was watching the motorman too. Q.—How do you know that the motorman did not immediately attempt to stop the car? A. —Well, I know that he didn't put the brake on at first, because he had an idea, at least I did, that the man was going to get off the track. Q.—Do you mean to say the motorman couldn't have applied his brakes, the handle of his air brake, and you not notice it? A.—I was noticing that, I could see him, you know, if he did that at first, right at the time. Q.—Are you judging that the motorman did not apply his brakes at once because you felt no slowing up of the car? A.—Well, if he did I did not see him.

Guy W. Bartlett:

Q.—How far was the car from the man and team when you first saw it on the track? A.—One hundred and fifty yards, I guess. Q.—I will ask you, Mr. Bartlett, whether or not your best judgment in the matter then was and is now that the distance was one hundred and fifty yards? A.—One hundred and fifty yards, or more. Q. —After first seeing Mr. Roschi and his team on the track, please state what the motorman did from that time up until the car struck them. A.—I wasn't noticing the motorman at all; I do know the whistle blew continuously until just before we struck them. Q.—Did you see the motorman do anything other than blow the whistle? A. —No, sir, I didn't notice him at all. I didn't see him doing anything. Q.—Did he put on the brake? A.—I couldn't say if I didn't see him, and I did not see him. Q.—Please state if you felt any jar on the car from the time you first saw Mr. Roschi on the track until the car struck him? A.—Yes, sir, I did. Q.—If so, describe what kind of a jar that was? A.—Why it was like a sudden stopping. Q.—Where was that sudden stopping with reference—how far away from the man and team was this sudden stopping that you describe? A.—About fifty yards. Q.—Do you know what caused that sudden stopping? A.—I thought the brakes were being applied. Q. —Had you noticed anything of that kind before the car reached the point fifty yards from Mr. Roschi? A.—No, sir, I had not. Q.—The only thing which you know about the stopping of the car is that you say at fifty or seventy-five yards back you felt the stopping of the car? A.—Yes. Q.—As to whether or not the brakes had been put on or not, you don't know? A.—I don't know whether the brakes had ever been put on then or not.

C. F. Barber:

Q.—After these signals commenced to be given and which you have called distress signals, tell the jury whether or not you felt any jarring of the car? A.—No, sir, I never felt no jar. Did you see the motorman apply his brake. A.—I don't know his brakes from anything else. Q.—Did you see him do anything there at all? A.—Yes, sir. Q.—What did he do with his hands. A.—He was moving them around there. Q.—Did you see him working his reverse? A.—No, sir. Q.—What was he doing with them moving them around—what kind of mov-

ing around? A.—I never paid no attention. Q.—Did you see him doing anything with his hands with reference to anything of this kind? A.—I don't know whether he put on his brakes or not. Q.—You said he was doing something with his hands, what was that? A.—Pretty often I see a motorman moving around and back, but what they do I don't know. Q.—Did you see him doing that on that occasion? A.—Yes, sir. Q.—He was moving some of those levers? A.—Yes, sir. Q.—Was that down at the bottom of the hill? A.—Yes, sir. Q.—Just about the time he began to blow his whistle you saw him moving these levers? A.—Yes, sir.

Edgar Sousley, the conductor, had left defendant's employment and was not present, but an affidavit of what he would testify was admitted and is in part as follows:

"That he was facing forward and saw a team of horses turn toward the track; at that time the car was not more than 250 feet from the place of the accident, that he then turned and walked back and the car was running at that time between thirty and thirty-five miles per hour; that the motorman immediately blew his whistle and continued to blow same until the accident occurred; that by the movement of the car he could tell that the motorman had placed his air in the emergency, and a short distance before the accident he felt the reverse; that as the decedent came upon the track he had his back to the car and never looked at any time towards the car while he was looking forward."

W. L. Smith:

Q.—Were you on this car on the day of the accident last December? A.—Yes, sir. Q.—Where were you in the car that day? In the colored compartment on the left-hand side of the car coming this way. Q.—Did you at any time see this wagon and team of Mr. Roschi's? A.—No, sir, the first time I noticed it was when Mr. Speaks began to blow his whistle and kept blowing and ringing his bell and I raised up in the seat. Q.—What did you see then? A.—The horses were on the track and the gentleman was at the head of the horses trying to hold them off. Q.—Did you feel anything on the car? A.—After he blew his whistle several times you could feel the brakes on the car.

All of this evidence, with the possible exception of a part of that of Adams and Bartlett, is clearly corrobora-

tive of the testimony of the motorman that he did every-
thing he could and as rapidly as possible, to give deceased
warning and to stop the car, just as or immediately after
deceased's team turned off the pike into a position of
peril, and even the statements of Adams and Bartlett are
not in conflict therewith. Adams' statement that the
motorman did not commence to stop the car right at the
time the distress signal was given must necessarily be
considered in connection with his other testimony that his
attention was not attracted to either the motorman or the
danger ahead of the car until after the distress signals
were given, and that he had an idea, as he supposed the
motorman did, "that the man was going to get off the
track," and he does not deny that the motorman applied
the brakes and did everything he could to stop the car as
soon as the true situation was apparent to him. More-
over, since from his and Bartlett's evidence the witness,
Adams, was not looking and did not see what the mo-
torman did when he began to give his distress signals and
when the motorman and Childers say he turned off the
current and put the brakes in emergency, it is apparent
that it was the action of the motorman in reversing the
motor that the witness had reference to when he said
that the motorman did not commence to stop the car
immediately. But even this was done, according to his
evidence, as soon as he, and as he supposed the motorman
as well, realized deceased was not going to get off of the
track in time to avoid a collision. Bartlett's statement,
too, that the car was within one hundred and fifty yards
or more of the accident when the whistle began blowing,
and he felt a sudden stopping within fifty or seventy-five
yards of the accident, shows that the motorman, in the
distance of seventy-five or one hundred yards, sounded
the alarm and had taken such steps as made the car sud-
denly begin stopping, which is certainly no evidence of a
want of ordinary care when we remember the car was go-
ing approximately thirty miles an hour, or one hundred
yards in less than seven seconds, as some little time at
least must necessarily be allowed to the motorman for do-
ing the several things it was necessary for him to do to
give the alarm and stop the car, and for such action to be-
come noticeable from the sudden stopping of the car. L.
& N. v. Stokes Admrs., *supra*.

As regrettable as is the death of this man, to avoid the consequences of his negligence, the defendant, through its motorman in charge of the car, was only required to exercise such reasonable care as persons of ordinary prudence and presence of mind would have exercised under like circumstances, and to hold that this evidence shows any negligence upon the part of the motorman would be necessarily upon the hypothesis that the company was liable if he failed in any degree to exercise the utmost care possible by immediately comprehending the whole situation and losing not a second in the performance of every duty imposed upon him by a sudden emergency. Such presence of mind and efficiency are not possessed by ordinary men nor available to the defendant, and hence plaintiff was not entitled to protection in that extreme degree, and the trial court erred in refusing to direct a verdict for the defendant. The only other error complained of that we need notice is the inclusion in that part of instruction No. 2 presenting the last clear chance rule, ''or could by the exercise of ordinary care after being aware of decedent's presence on or in dangerous proximity to the track have seen his peril,'' which was error since it was superfluous and may have been confusing to the jury and prejudicial to defendant, as there was no evidence decedent's peril existed or could have been discovered sooner than it was seen by the motorman.

Wherefore the judgment is reversed with directions to grant defendant a new trial in conformity herewith.