## Kentucky Traction & Terminal Company v. Brackett.

(Decided October 23, 1925.)

### Appeal from Fayette Circuit Court.

1. Railroads—Plaintiff had Burden of Proving Motorman Could Have Stopped Car in Time.—Plaintiff, seeking to recover for injuries sustained when automobile got beyond driver's control and went upon electric car track alongside road, has burden of showing that motorman on approaching car after discovering his peril could with means at hand have stopped car in time to have avoided collision.

2. Railroads—Evidence Held Sufficient to Show Motorman Could Have Stopped Car After Discovering Peril.—Evidence held insufficient to show that motorman, after discovering peril of occupants of automobile which was unable to leave car track, could with means at hand have stopped car in time to have avoided collision.

3. Evidence—Expert Testimony is Insufficient to Contradict Certainly Established Physical Fact to Contrary.—Expert testimony as to distance within which electric car could be stopped is insufficient to contradict established physical fact that car did not stop within such distance.

4. Railroads—Want of Signals Held Immaterial.—Where evidence shows that automobile went upon car track against driver's wish and in spite of his efforts to keep it in roadway alongside track, lack of evidence of any signals given by approaching car is immaterial.

ALLEN, BOTTS & DUNCAN and WALLACE MUIR for appellant.

SMITH & REYNOLDS for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

The appellant, which was defendant below, seeks by this appeal, to reverse a judgment for $798.00 recovered against it by the appellee, who was plaintiff below. This suit grew out of a collision which happened about eight A. M. on November 22, 1923, on the highway between Lexington and Georgetown, Kentucky. This wreck occurred just over the line in Scott county, about eight miles from Lexington. On the morning of the accident, the plaintiff had been asked by Benny Underwood to go hunting, and they had left Lexington in Underwood's machine, and were traveling the pike from Lexington to Georgetown when the accident occurred. It appears

that Underwood tried to pass a machine driven by one Mulhollan, and in so doing, Underwood lost control of his car, and it ran up onto the defendant's railroad track. Between these two cities the track of the defendant is built along the west side of the pike, while the east side of the pike has been graded and paved with asphalt for the use of the public. There had been a light rain and a heavy mist, as a result of which the roadway and also the defendant's track were wet and slippery.

At the time the car in which plaintiff was riding skidded onto the track of defendant, one of defendant's traction cars, No. 301, *en route* from Georgetown to Lexington, came over the hill. The accident occurred on a gently sloping hillside. It was down grade for the traction car. The grade was approximately a fall of a foot and a half in one hundred feet. There is considerable conflict in the evidence as to how far the car was from the automobile when it came onto the track, but some of these distances were very well established. From the tracks of the automobile, we know that it ran along the railroad track for two hundred and twenty-five feet before the happening of the accident. We also know from the marks on the rails where the wheels of the traction car had slid, that it went three hundred and twelve feet with the wheels locked before the accident occurred.

Both the car and the automobile were traveling at the rate of about twenty-five miles per hour, and thus they were approaching each other at the rate of fifty miles per hour. The motorman testified that he saw the automobile in the highway about one hundred yards before it skidded upon the track, and as the traction car was going at about the same rate of speed that the automobile was, it is reasonable to suppose that at the time he first saw the car in which plaintiff was riding, he was three hundred feet from the point where his car was when the automobile came onto the railroad track. Thus it appears from the evidence of the motorman, that he saw this automobile first when he was about eleven hundred and thirty-seven feet from it. The motorman had no reason to anticipate that the automobile would leave the highway and come up on the railroad track, hence was under no duty to stop his car merely because he saw an automobile on the highway. Not a witness attempts to show that the motorman could have seen this automobile any sooner than he says he saw it.

When the automobile came upon the track of the defendant, the defendant's motorman must have known that the occupants of the automobile were in peril, and he says that he at once put his car into emergency and did everything possible to stop his car and avoid striking the automobile. The driver of the automobile said that after he got upon the track, he traveled along it about ten or fifteen feet, and then tried to turn his car back on the highway, but that he had burst the tire on the left front wheel when he came upon the railroad, and when he attempted to turn back into the highway, this tire came off, and the rim would not climb the rail. He then pulled over in the track again and ran about fifteen feet, then made another effort to get back on the highway, and again the rim of the front wheel failed to climb the rail, merely skidding along it. He then steered his car back on the track so that his left wheels were against the left rail and his right wheels against the right rail, in order that his car, when struck, should be struck full in the face, hoping thereby to avoid being injured. He says that he stopped his motor when he was about fifty feet from the traction car. The evidence about the stopping of the motor is conflicting, and it would seem from the weight of the evidence, that both the automobile and the traction car were moving at the rate of about five miles per hour when the collision occurred. Underwood doesn't say that he had slackened his speed before that time, and it is reasonable to suppose that this fifty feet was divided between the traction car and the automobile, and that the collision occurred about twenty-five feet from the point where he shut off his motor.

Both Underwood and Brackett sustained serious injuries. Brackett, by this action, recovered the judgment noted. To sustain this judgment, it was necessary for Brackett to show that after his peril was discovered, the defendant's motorman could, with the means at hand, have stopped his car in time to have avoided striking the automobile. He failed to prove this.

From the evidence, it appears that this particular car was so built that it is necessary for the motorman to either hold down the control lever with his hand or hold his foot on the control valve all the time that the car is running, and that if he takes his hand off of the control lever and his foot off of the control valve, the current is

automatically cut off, the air brakes applied in emergency, and sand applied to the rails.

Plaintiff introduced Miss Cora Bell Carlton, who testified that she saw the automobile on the track and called the motorman's attention to it, and that he never stopped the car, but merely stepped back. That was all she saw him do. She testified that the car was going faster when it struck the automobile than it was when she called the motorman's attention to the automobile on the track.

Plaintiff also introduced as a witness, Prof. Charles H. Anderson, who had designed this car, and he was asked in what distance this car could be stopped when traveling at the rate of twenty-five miles per hour, and he testified that it would probably run one hundred and twenty-five to one hundred and fifty feet after the brakes were applied; but he also testified that the condition of the rails and the grade upon which the car was traveling, would tend to change that distance. The marks on the rails show that this car had slid three hundred and twelve feet with the wheels locked, and as said by this court in Kentucky Traction & Terminal Co. v. Roschi's Admr., 186 Ky. 371, 216 S. W. 579:

> " . . . the expert evidence is insufficient to contradict the certainly established physical fact that the car would not stop. . . . "

The motorman testified that he had done everything that could be done to stop his car, and that he stepped back to avoid being injured by glass.

The track foreman of the defendant was on this car at the time, standing in the front of the car near the motorman, and he said that at the time the automobile came upon the track, the motorman set his car in emergency.

The defendant introduced G. S. Anderson, who is its supervisor of interurban lines, who was at one time a motorman, and who was for some time an instructor training men in the operation of these cars. He was asked if there was anything else that could be done to stop a car, after it had been put into emergency, and he said that there was not; that after the wheels were locked and began to slide, all that could be done was to let it slide.

Miss Carlton testified that she saw the motorman do nothing but step back and doubtlessly she honestly felt that the motorman had carelessly allowed this car to run on and strike the automobile. Her belief is possibly accounted for by her not knowing that the car was automatically controlled. In the Roschi case, *supra,* this court said:

"As regrettable as is the death of this man, to avoid the consequences of his negligence, the defendant, through its motorman in charge of the car, was only required to exercise such reasonable care as persons of ordinary prudence and presence of mind would have exercised under like circumstances, and to hold that this evidence shows any negligence upon the part of the motorman would be necessarily upon the hypothesis that the company was liable if he failed in any degree to exercise the utmost care possible by immediately comprehending the whole situation and losing not a second in the performance of every duty imposed upon him by a sudden emergency. Such presence of mind and efficiency is not possessed by ordinary men, nor available to the defendant, and hence plaintiff was not entitled to protection in that extreme degree, and the trial court erred in refusing to direct a verdict for the defendant."

It seems to us that this last quotation fits this case exactly; but the plaintiff says that in the Roschi case, the motorman cut off his current, put his brake in emergency, and reversed the motor, while in this case there is no evidence that the motorman reversed the motor. That is true, but there is also no evidence that reversing the motor would have done any good. There is no evidence that the car by which Mr. Roschi was killed is the same sort of car or controlled in the same way as this one.

There is some evidence that no signals were given of the approach of the traction car, but as the evidence shows that the automobile went upon the track against the wish of the chauffeur, and in spite of his efforts to keep it in the roadway, the failure to give signals, if admitted, would not have affected this case.

Miss Kemper says that she felt the application of the brakes before Miss Carlton screamed. From the evidence of Kayes, it is apparent that the brakes had

been applied before Miss Carlton screamed, for he says her screaming was the first thing that attracted his attention, and that the motorman did nothing. Presently he noticed the car stopping. The evidence of these witnesses shows the brakes were already applied in emergency when Miss Carlton screamed. The plaintiff failed to show any failure of defendant's motorman to do anything he could to stop the car after he saw the peril of the plaintiff. The burden was on plaintiff to establish by evidence, negligence on the part of the defendant. He failed to establish it. Therefore, the court should have instructed the jury to find for the defendant.

The judgment is reversed with directions to grant the defendant a new trial to be had in conformity with this opinion.