## Ohio Valley Electric Railway Company v. Payne, et al.

(Decided March 16, 1926.)

### Appeal from Boyd Circuit Court.

1. Railroads—Electric Railway Held Liable for Injury to Pedestrian Hurled on Track by Automobile Only if Motorman did Not Use Ordinary Care After Discovering Peril.—Where electric car injured pedestrian who was struck by automobile and hurled onto track, railway was liable only if motorman failed to use ordinary care to prevent injury after discovering peril, since he was not required to maintain lookout for such occurrence.

2. Railroads—Evidence Held Insufficient to Submit to Jury Question of Negligence of Electric Railway as to Pedestrian Hurled on Track by Automobile.—Evidence as to care exercised by motorman after discovery of peril held insufficient to take case to jury in personal injury action against electric railway by pedestrian who was struck by automobile and hurled on track in front of car.

GEORGE B. MARTIN and JOHN L. SMITH for appellant.

S. S. WILLIS for appellee.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Reversing.

This is an appeal by the Ohio Valley Electric Railway Company from a judgment for $5,000.00 rendered against it in the Boyd circuit court in favor of Moseby H. Payne, an infant who sued by next friend, for personal injuries found by the jury to have resulted from appellant's negligence.

Appellant insists that appellee made no case and that it was entitled to a directed verdict. The facts briefly are these: Appellant at the place where the injury occurred owns its right of way on which its track is maintained. Its track parallels a paved highway and is approximately seven feet from the east curb and gutter. To the east of its track no dwelling houses are located, but from its right of way the ground slopes precipitately to river bottom farming lands. There was no crossing or easement of any character over appellant's track at the place where the accident occurred. The grounds of the Kenova and Ceredo high school are situated immediately west of the highway. Appellee was a student of that institution and was leaving its grounds about 5:30 p. m., after having engaged with some of his fellow students in a practice game of basketball. He observed one of appellant's electric cars approaching from the north and desiring to board it started in a run from the school grounds to the car stop across the highway. He testified that before leaving the sidewalk he observed an automobile approaching from the same direction as the electric car was, and, although it appeared to be running at a rapid rate of speed, he concluded that he could cross its path before it reached him and undertook to do so. He testified that, after he had crossed beyond the center of the highway, which put him beyond that portion of the highway which could lawfully be used by cars approaching as was the one which he had observed, either it or another car, which he had not seen, but which approached from the same direction, struck him and hurled him, then unconscious, across the remainder of the highway and upon appellant's tracks. The trolley, which he had seen approaching and which he intended to board, ran over one of his legs necessitating its amputation.

The case was submitted to the jury upon the theory that there was evidence that the motorman in charge of the street car failed to use ordinary care by the use of the means at his command to prevent injury to appellee after discovering his peril. No other theory of liability could be sustained, as none of the facts or circumstances surrounding this unfortunate transaction imposed upon appellant or the motorman in charge of its trolley the duty of anticipating the presence of anyone on its tracks at the place in question. They can not be held to have been under the necessity of anticipating that appellee would be struck by a passing automobile and hurled upon

the track in front of the interurban car and hence under the necessity of maintaining a lookout for the occurrence.

The testimony herein differs materially as to the distance the interurban car was from appellee when he was thrown upon its tracks. One witness, who was driving an automobile and who testified that it and the interurban were proceeding in the same direction and at about the same speed and alongside each other, and who saw appellee hurled upon the track by the automobile ahead, testified that the street car then was approximately 350 feet from the boy. If his estimate of the distance is correct and if the motorman had discovered the boy's peril when that witness did, there would have been time sufficient to stop the interurban and thereby prevent injury to appellee from it. The same witness, however, testified that he increased the speed of his automobile in an effort to reach appellee and extricate him from his perilous position before the interurban struck him, and that as he passed it he observed that the motorman was turned away from the front of the car engaged in conversation with a passenger. Another witness, one of appellee's playmates, who left the school grounds as he did and who saw the accident from the sidewalk immediately across the street, when asked how close the street car was to appellee when he was thrown upon the track, responded: "Right on him." Further asked to estimate the distance he said: "I judge about a car length and a half." L. B. Meridith was the only witness who testified as to the time when the motorman of the street car discovered appellee's peril and what he did upon doing so. On that question he testified:

"Q. When you first saw the boy on the track how far away from him was the street car? A. Well, I didn't pay so much attention to it at the time. I judge two and a half or three car lengths. Q. What did you do then? A. I first looked at the boy and looked at the motorman to see what he was doing. A. Well, he had the air on as much as I could see as far as it would go, or ahold of the controler and threw the air on. Q. What kind of a stop did he make? A. Just an ordinary stop like any other one was. Q. Was the emergency brakes applied at all? A. So far as the entire car, I didn't see any put on, the rope emergency was not put on. Q. How soon did he stop, after he began trying to

stop what distance did he run? A. It run probably four car lengths after I noticed him trying to stop. Q. How fast was the car going? A. Well, I have no way of knowing that, I judge probably 25 or 30 miles an hour. Q. You know the mechanism by which a street car is operated? A. Yes, sir."

This testimony, unexplained, would perhaps have taken the case to the jury on the question as to whether or not the motorman exercised ordinary care by the use of the means at his command to stop the car and save appellee from injury after discovering his peril. However, it was clarified by the cross-examination as follows:

"Q. You are not a motorman are you? A. No, sir. Q. And you never operated a street car? A. No, sir. Q. You say that the rope emergency was not put on, what do you mean by that? A. Well, there is a cord that goes through the car that goes to the air that you put on the brake with if it should be pulled isn't there? Q. I am asking you. A. I am just telling you what I think, all I know about it. Q. Didn't you tell the court that you knew all about the mechanism of a street car? A. As far as the electric part, the front part, I know it alright. Q. Now this rope emergency is a rope you think that runs through the car? A. That is what I call it, I don't know anything else. Q. And that was used in stopping cars? A. I suppose that it was. Q. You don't know? A. I don't know. Q. Does the motorman have access to that rope? A. Not to my knowing. Q. Could he more effectively stop the car by using the rope than he could by using the air with his hand? A. No, he couldn't. Q. So you don't mean to be understood that he could have used the rope there and stopped the car any quicker? A. No, I don't mean to insinuate that at all. Q. You understood that when the motorman throws the air lever as far to the right as he can throw it that that is all he can do towards putting on the brakes? A. Yes, sir."

From his testimony as a whole it appears that as soon as he discovered appellee and his peril the motorman did all that could be done to stop his car without injury to appellee. There is testimony from no other witness that in the least tends to establish that the motor-

man discovered appellee's peril when the car was at any greater distance from him than that indicated in the testimony quoted above. There is testimony from no witness which tends in the least to establish that the motorman failed to act with all promptness and dispatch to put in use all of the means at his command to bring his car to a stop before injuring appellee after he discovered his peril. If appellee was hurled upon appellant's track when the street car was yet approximately 350 feet from him, as was testified by one of the witnesses, it is extremely unfortunate that the motorman did not happen then to be looking in that direction and to observe appellee and his peril. But as above pointed out, the testimony of the witness who thus estimated the distance the car was from him when he was thrown upon the track, also made it appear that the motorman was not looking in that direction and could not have discovered appellee's peril. The case against appellant can not be predicated upon the distance the car was from appellee when he was thrown upon the track. Appellant's liability did not attach for failure of its motorman to act following that event. Its liability to appellee attached only for the failure of the motorman to act after he discovered the peril of appellee. The argument that the car could have been stopped in less than the distance some of the witnesses placed it from appellee when he was thrown upon the track is beside the point. The case falls because no witness gives evidence tending to establish a negligent failure to act upon the part of the motorman after he discovered appellee's peril. The evidence is that the motorman did all that could have been done.

Our careful consideration of this entire record forces us to the conclusion that there was not evidence enough to take the case to the jury. Our conclusion to that affect is sustained by our previous opinions rendered in cases with similar circumstances. See Kentucky Traction & Terminal Company v. Bracket, 210 Ky. 756; and Kentucky Traction & Terminal Company v. Raschis' Admr., 186 Ky. 371, 216 S. W. 579. Hence, the trial court erred in not sustaining appellant's motion for a directed verdict at the close of appellee's testimony.

Wherefore, the judgment herein is reversed and this cause remanded for further proceedings consistent herewith.

Whole court sitting.